Herman L. BALLARD, et al., Plaintiffs,

v.

BLUE SHIELD OF SOUTHERN WEST VIRGINIA, Blue Shield of Northern West Virginia, Morgantown Medical-Surgical, Inc., Medical Surgical Care, Inc., and West Virginia State Medical Association, Defendants.

Civ. A. No. 75–0005.

United States District Court,
S. D. West Virginia,
Huntington Division.

Sept. 10, 1981.

William D. Levine, Huntington, W. Va., for plaintiffs.

Frederick P. Stamp, Wheeling, W. Va., William Mohler, Charleston, W. Va., Fred Adkins, Huntington, W. Va., W. T. Shaffer, Charleston, W. Va., Fred L. Davis, Jr., Parkersburg, W. Va., for defendants.

## MEMORANDUM OPINION AND ORDER

STAKER, District Judge.

In this action, all named defendants have moved for summary judgment and it is the disposition of those motions that are presently before the court. Because of the magnitude of this case and the complexity of the issues involved, clarity will require a brief chronicle of the proceedings had to date herein.

This is an antitrust action, originally filed in 1975 by the plaintiffs who are chiropractors working within the State of West Virginia. The defendants, Blue Shield of Southern West Virginia, Blue Shield of Northern West Virginia,[1] Medical Surgical Care, Inc., and Morgantown Medical-Surgical Inc. are organizations commonly referred to as medical service corporations as defined in *W.Va.Code* § 33–24–2(d).[2] These defendants are major providers of Blue Shield Health Insurance in West Virginia.[3] The named individual defendants are the physicians who have been or are presently members of the boards of directors of these corporations. Also joined as a defendant is the West Virginia State Medical Association.

In their complaint the plaintiffs have named as alleged co-conspirators, but not as defendants, the American Medical Association (A.M.A.) and the Blue Shield Association.[4] It is the plaintiffs' theory that the American Medical Association and the Blue Shield Association have conspired together to formulate and institute policies the goal of which is the containment and elimination of chiropractic as a profession and that these anti-chiropractic policies have been adopted by state medical associations, including the defendant, West Virginia State Medical Association, as well as by local Blue Shield plans, including the defendant medical service corporations.

The gravamen of the plaintiffs' action is that the defendant medical service corporations, through their physician-controlled boards of directors, have combined and conspired to refuse to offer health insurance coverage for chiropractic services on a basis equivalent to that offered by them for serv-

1. In 1980, Medical Service, Inc. and Medical Surgical Service, Inc. merged to form Blue Shield of Northern West Virginia. Both corporations were named as defendants in the original action.

2. W.Va.Code § 33–24–2(d) Provides:
   "Medical service corporation" shall mean a nonprofit, nonstock corporation, organized in accordance with the provisions of article one [§ 31–1–1 et seq.], chapter thirty-one of this Code, for the sole purpose of contracting with the public and with duly licensed physicians, duly licensed dentists and duly licensed podiatrists for medical or surgical services and with duly licensed chiropractors and other health agencies for other health services to be furnished to subscribers under terms of their contract with the corporation, and controlled by a board of directors, not more than twenty per-

cent of whom, or whose spouse, parent, child, brother or sister by blood or marriage are engaged in the providing of health care and at least eighty percent of whom shall be chosen as representatives of the interests of consumers, elderly persons, organized labor and business subscribers.

3. Although the terms are often used interchangeably, Blue Cross provides coverage for hospital services while Blue Shield provides coverage for medical services rendered by health care practitioners.

4. The Blue Shield Association was formerly known as The National Association of Blue Shield Plans and it is the latter name which appears throughout the record.

ices rendered by doctors of medicine. Such a denial of coverage, the chiropractors claim, is violative of sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1, 2) in that such conduct amounts to a boycott of the chiropractic profession. The plaintiffs assert that those activities of the defendants result in a restraint of trade which gives medical doctors a monopoly of the health care services market by making chiropractic services financially unattractive to consumers.

Following the institution of this action, a district judge of this court granted the defendants' motion to dismiss. It was held that the actions complained of did not affect interstate commerce and thus, the court lacked jurisdiction under the Sherman Act. That district judge also ruled that the defendants' activities were exempted under provisions of the McCarran-Ferguson Act (15 U.S.C. §§ 1011–1013) and the learned profession doctrine.

On appeal, the Fourth Circuit Court of Appeals held in *Ballard v. Blue Shield of Southern West Virginia*, 543 F.2d 1075 (4th Cir. 1976) that the effect of an alleged boycott on interstate commerce was not so insubstantial as to deny federal jurisdiction under the Sherman Act. The court relied on *American Medical Association v. United States*, 317 U.S. 519, 63 S.Ct. 326, 87 L.Ed. 434 (1943) and *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975) in ruling that the professional status of the individual defendants as physicians afforded them no defense as long as their commercial activity was interstate in character.

With regard to the "business of insurance" exemption under the McCarran-Fer-

guson Act, the Court of Appeals held that because the plaintiffs had pleaded what was essentially a group boycott, the alleged conduct of the defendants fell within § 3(b) [5] of that Act. This section subjects boycotts in the business of insurance to the sanctions of the Sherman Act as one of three specific exceptions to the otherwise blanket immunity given to the state-regulated insurance industry by § 2(b) [6] of the same act. Accordingly, the court held that the defendant insurance providers could not claim the exemption under § 1012(b).

The Fourth Circuit also held that the lower court was correct in declining to base its decision to dismiss on the "state action" doctrine of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1941). This doctrine provides that the Sherman Act was not intended to interfere with the sovereign decision of a state to displace competition in a particular industry when that state has deemed it in the best interest of their citizenry to regulate its economy. The Supreme Court in *Parker* held that the Sherman Act was not applicable to acts of a state as a sovereign, but rather it was intended only to prohibit anti-competitive conduct in private business.

The Court of Appeals, relying again on § 3(b) of the McCarran-Ferguson Act, held that this statute so specifically evinced Congressional intent to subject boycotts in the insurance industry to the Sherman Act, that it would be unjustifiable to imply a contrary intention based on the *Parker v. Brown* analysis of the Sherman Act.

Pursuant to the decision of the Fourth Circuit Court of Appeals, this case was remanded to this court on November 11, 1976 for further proceedings. Since that time,

**5.** 15 U.S.C. § 1013(b) reads:
Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation.

**6.** 15 U.S.C. § 1012(b) reads:
No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless

such Act specifically relates to the business of insurance: *Provided*, That after June 30, 1948, the Act of July 2, 1890, as amended known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, *shall be applicable to the business of insurance to the extent that such business is not regulated by State law.* (emphasis added)

an amended complaint has been filed which, in addition to the allegations of the original complaint, now seeks redress pursuant to the provisions of the West Virginia Antitrust Act, W.Va.Code § 47–18–1 *et seq.* All of the defendants have answered and extensive discovery has been had for the last five years. The time period allowed for discovery has now expired and based upon the contents of a voluminous record, each defendant has now moved for summary judgment.

Defendant Blue Shield of Northern West Virginia has filed a brief in support of its motion and it appears that the remaining defendants wish to rely on that brief and incorporate it into their motions. The plaintiffs have submitted a brief in opposition to the defendants' motions and have appended thereto some eighteen exhibits.

The defendants have raised the following grounds which they assert would entitle them to summary judgment: (1) exemption under the McCarran-Ferguson Act; (2) insufficient evidence to support a finding of a boycott; (3) immunity under the "state action" doctrine of *Parker v. Brown*; and, (4) exemption under the doctrine of "implied repeal". Those grounds are dealt with in turn below.

### (1)

The defendants again contend, as they did in 1975, that they are exempt from the antitrust laws, based upon the provisions of § 2(b) of the McCarran-Ferguson Act[7] which exempts the business of insurance from the antitrust laws to the extent that such business is regulated by state law. In reversing the dismissal of this action, the Fourth Circuit ruled that the allegations of the plaintiff brought this case within the Act's exception for boycotts in § 1013(b).[8] The defendants now argue that the plaintiffs have failed to adduce such evidence as is necessary to prove a boycott, and therefore they are entitled to claim the exemption under § 1012(b) and have summary judgment entered in their behalf.

This court is of the opinion that whether or not a boycott has existed or exists presently is a question of fact going directly to the merits of the plaintiffs' case. Quite simply, if a boycott exists or has existed in the past, the plaintiffs may prevail before a jury and recover damages accordingly. Conversely, if there is or has been no boycott the plaintiffs will have failed to prove their case and the defendants will prevail without need for invoking the McCarran-Ferguson exemption. In short, by alleging a boycott, plaintiffs have precluded further inquiry regarding this exemption and must now be put to their proof.

The existence or non-existence of a boycott remains a genuine issue of material fact to be resolved herein and summary judgment is manifestly inappropriate.

### (2)

Over a six-year period, the court file in this action has become voluminous, and this court is unable to say that a jury might not draw differing inferences regarding the existence of a boycott. Indeed, documents submitted by the plaintiffs tend to indicate an anti-chiropractic bias on the part of the leadership of the American Medical Association. The factual materials in the record do not necessarily preclude plaintiffs' establishing at trial some nexus between the A.M.A. and one or more of the named defendants with regard to this anti-chiropractic attitude. Should such a nexus be established, a jury could find that there was concerted action among one or more defendants and the A.M.A. to boycott the chiropractic profession.

The casebooks are replete with admonitions against the granting of summary judgment in complex antitrust cases involving intent and motive. (*See* 10 Wright and Miller, Federal Practice and Procedure § 2730). The Fourth Circuit Court of Appeals recently had occasion to address this point:

---

7. See supra at note 6.

8. See supra at note 5.

Summary judgment under Rule 56, Fed. R.Civ.P. should be granted only where it is perfectly clear that there is no dispute about either the facts of the controversy or the inferences to be drawn from such facts.

. . . Accordingly, even though there may be no dispute about the basic facts, still *summary judgment will be inappropriate if the parties disagree on the inferences which may reasonably be drawn from the undisputed facts.* (emphasis added).

. . . And when the disposition of a case turns on a determination of intent, courts must be especially cautious in granting summary judgment since the resolution of that issue depends too much on the credibility of the witnesses, which can best be determined by the trier of facts after observation of the demeanor of the witnesses during direct and cross-examination.

. . . Since in antitrust cases "motive and intent" play leading roles, these rules take on added importance in that context.

*Morrison v. Nissan Co., Ltd.,* 601 F.2d 139, (4th Cir. 1979).

The case at bar seems to be a classic example of a situation in which there may be little dispute as to the facts, but great disagreement as to the inferences which might conceivably be drawn therefrom. The record before the court abounds with documents, depositions and interrogatories which, taken together, constitute a set of facts about which there is little dispute. Summary judgment, under these circumstances, will nevertheless be improper because it appears that these undisputed facts might yield conflicting inferences. Following presentation of evidence, a jury could conclude that no conspiracy to boycott has taken place among the defendants and that the activities complained of were entirely reasonable under the circumstances.

Conversely, a jury as well could conclude from the evidence that the defendants did in fact conspire to prevent chiropractors from obtaining Blue Shield coverage for their services on a basis commensurate with that provided to physicians. In any event, such a determination must be made by the trier of fact following presentation of all the evidence, as this case is not one appropriate for summary judgment.

(3)

The defendants have asserted in the alternative that the "state action" doctrine of *Parker v. Brown, supra* will immunize them from liability for their allegedly anti-competitive activities. The defendants' reliance on this doctrine is misplaced.

In *Parker,* the United States Supreme Court held that the Sherman Act was not meant to supplant regulatory policies, which are nonetheless anti-competitive in nature, when such policies are mandated by sovereign state authority. The Court, in *Parker,* found that the legislative history of the Sherman Act indicated no intention to restrain state action or official action directed by the state. Rather, the act was intended only to operate as a bar to private action in restraint of trade.[9]

The assertion that the "state action" doctrine exempts the alleged activities of the defendants from the Sherman Act must be rejected. Section 3(b) of the McCarran-Ferguson Act makes clear the intent of Congress to preserve Sherman Act liability for boycotts which take place within the insurance industry. The rationale behind *Parker* and the state action doctrine cannot properly be utilized to circumvent the *express* intent of Congress as evidenced in § 3(b) of the McCarran-Ferguson Act. As the Court noted in *Parker,* a state may not authorize violation of federal law.[10] Accordingly, the state action doctrine cannot

**9.** Justice Stone writing for the court stated at 317 U.S. 351, at 63 S.Ct. 313:

There is no suggestion of a purpose to restrain state action in the Act's legislative history. The sponsor of the bill which was ultimately enacted as the Sherman Act declared that it prevented only "business com-

binations." 21 Cong.Rec. 2457, 2562, see also at 2459, 2461. That its purpose was to suppress combinations to restrain corporations, abundantly appears from its legislative history.

**10.** True, a state does not give immunity to those who violate the Sherman Act by autho-

be employed to shield the defendants from liability for an alleged boycott when Congress has explicitly prohibited such activity.

Furthermore, the defendants do not have the degree of state involvement required to exempt their alleged boycott under the state action doctrine. Assuming arguendo, that a boycott could escape scrutiny under the Sherman Act by invocation of the state action defense, the defendants in this case do not satisfy the two-prong test recently established by the United States Supreme Court as a prerequisite to asserting such a defense.

In *California Liquor Dealers v. Midcal Aluminum*, 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) the Court established two criteria which must be satisfied before the state action doctrine can be interposed to avoid liability under the Sherman Act:

> First, the challenged restraint must be one clearly articulated and affirmatively expressed as state policy; second, the activity must be actively supervised by the state.

The defendants in this case rely on the general and beneficent language of W.Va. Code § 33–24–1 [11] and the supervisory powers exercised by the West Virginia Commissioner of Insurance pursuant to W.Va.Code §§ 33–24–6 and 33–24–5(c) [12] in asserting that they do meet the two part test laid

rizing them to violate it, or by declaring that their action is lawful .... 317 U.S. at 351, 63 S.Ct. at 313.

**11.** W.Va.Code § 33–24–1. Declaration of Policy

In view of the desirability of making available to the people of this State increased hospital, medical, dental services and other health services, the declared policy of the legislature in the enactment of this article is to encourage the organization, promotion, and expansion of hospital service corporations, medical service corporations and dental service corporations by exempting them from the payment of all taxes and from the operation of the general insurance laws of this State, but at the same time subjecting them to such regulation as may be necessary for the adequate protection of those members of the public who subscribe for the services offered by such corporations. (1957, c. 97; 1959, c. 88)

**12.** W.Va.Code § 33–24–5(c):

Within thirty days after receipt of an application, the commissioner shall, upon payment to him of a license fee of one hundred dollars, issue a license authorizing the corporation to transact business in this State in the area to be served by it, if he is satisfied (1) that the applicant is incorporated in this State under the provisions of article one [§ 31–1–1 et seq.], chapter thirty-one of this Code, as a bona fide nonprofit corporation, (2) that the contracts between the corporation and participating hospitals, physicians, dentists, and other health agencies contain all the terms required by section seven [§ 33–24–7] of this article (3) that the working capital available to the corporation will be sufficient to pay all operating expenses, other than payment for hospital, medical or dental services, for a reasonable period after the issuance of the license, and (4) that the proposed plan will serve the best interests of all the people of the area in which the corporation intends to operate, regardless of their race, color or economic status. Any license so issued may be renewed annually upon payment to the commissioner of a renewal fee of one hundred dollars.

W.Va.Code § 33–24–6. Commissioner to enforce article; approval of contracts, forms, rates and fees

(a) It shall be the duty of the commissioner to enforce the provisions of this article.

(b) No such corporation shall deliver or issue for delivery any subscriber's contract, changes in the terms of such contract, application, rider or endorsement, until a copy thereof and the rates pertaining thereto have been filed with and approved by the commissioner. All such forms filed with commissioner shall be deemed approved after the expiration of thirty days from the date of such filing unless the commissioner shall have disapproved the same, stating his reasons for such disapproval in writing, except that such period may be extended for an additional period not to exceed fifteen days upon written notice thereof from the commissioner to the applicant. Such forms may be used prior to the expiration of such periods if written approval thereof has been received from the commissioner.

(c) No rates to be charged subscribers shall be used or established by any such corporation unless and until the same have been filed with the commissioner and approved by him. The procedure for such filing and approval shall be the same as that prescribed in subsection (b) of this section for the approval of forms. The commissioner shall approve all such rates which are not excessive, inadequate or unfairly discriminatory.

(d) The Commissioner shall pass upon the actuarial soundness of the schedule of fees to

down in *California Liquor Dealers, supra.* This argument by the defendants presupposes the plaintiffs' allegations of a boycott to be without merit, because as stated previously, a state could not establish a policy supportive of boycotts and actively support such illegal conduct. Even if the challenged restraint were not one specifically prohibited by a federal statute, the policy expressed in W.Va.Code § 33–24–1 and the function of the Commissioner of Insurance in overseeing the issuance of policies fall woefully short of the affirmative participation of the sovereign contemplated by the *Parker* decision.

Prior to the decision in *California Liquor Dealers,* the U.S. Supreme Court on several occasions articulated the degree of state involvement required for the state action defense of *Parker* to be appropriate:

*Goldfarb v. Virginia State Bar,* 421 U.S. 773, at 791, 95 S.Ct. 2004, at 2015, 44 L.Ed.2d 572:

> anti-competitive activities must be compelled by direction of state action as a sovereign.

*Cantor v. Detroit Edison Co.,* 428 U.S. 579, at 598, 96 S.Ct. 3110, at 3121, 49 L.Ed.2d 1141:

> We conclude that neither Michigan's *approval* of the tariff filed by respondent, or the fact that the . . . program may not be terminated until a new tariff is filed is sufficient basis for implying an exemption from the federal antitrust laws for that program. (emphasis added)

*Bates v. State Bar of Arizona,* 433 U.S. 350, at 362, 97 S.Ct. 2691, at 2698, 53 L.Ed.2d 810.

> We deem it significant that the state policy is so clearly and affirmatively expressed and the state's supervision is so active.

Thus, notwithstanding the clear intent expressed in § 3(b) of McCarran-Ferguson Act, it is obvious that the defendants do not have sufficient state authority to invoke *Parker v. Brown.*

For the foregoing reasons, this court declines to grant summary judgment for the defendants based on the state action doctrine.

(4)

Finally, the defendants raise the doctrine of "implied repeal" as a basis for summary judgment in their favor. Such contention is not well taken.

"Implied repeal" is the term which is used to identify those instances when Congress has enacted some statute or regulatory scheme which is inconsistent with the operation of the antitrust laws. This occurs in those areas where it has been determined that free and open competition is not in the public interest and, in such a case, Congress is said to have "impliedly repealed" the antitrust laws so as to permit the statute or regulations in question to operate effectively. It is fundamental to the concept of implied repeal that the regulations or statute involved be part of a federal plan.[13]

In *National Geremedical Hospital and Gerentology Center v. Blue Cross of Kansas City,* 452 U.S. 378, 101 S.Ct. 2415, 69 L.Ed.2d 89 (1981), Justice Powell, writing for the Supreme Court stated:

> To be sure, where *Congress* did intend to repeal the antitrust laws, that intent governs . . . but that intent must be clear. (emphasis added)

452 U.S. at 389, 101 S.Ct. at 2421, 69 L.Ed.2d at 99.

Certainly there is no federal scheme involved in this case and as such, this argument by the defendants is inapposite. Moreover, assuming that this case involved a federal regulatory plan and that, notwithstanding the supremacy clause, a state could repeal federal legislation, it would be

---

> be paid hospitals, physicians, dentists and other health agencies. (1957, c. 97; 1959, c. 88).

**13.** See: *U. S. v. Philadelphia Nat. Bank,* 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963). *U. S. v. First City Nat. Bank,* 386 U.S. 361, 87 S.Ct. 1088, 18 L.Ed.2d 151 (1967). *U. S. v. Borden Co.,* 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181 (1939). *Gordon v. N.Y. Stock Exchange,* 422 U.S. 659, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975).

anomalous to suppose that such a repeal would be *implied* so as to emasculate the specific intent of Congress to subject boycotts to the Sherman Act. Accordingly, the defendants may not avail themselves of the defense of "implied repeal" in this case.

In conclusion, the plaintiffs have alleged a boycott within the insurance industry, and as such, the defendants may not properly assert the defenses of state action under *Parker v. Brown*, exemption under § 2(b) of the McCarran-Ferguson Act, or the doctrine of implied repeal to circumvent the plain intent of Congress as found in § 3(b) of the McCarran-Ferguson Act. Given this, the only relevant inquiry on a motion for summary judgment is whether there are any material facts in dispute or whether, should the facts be clear, differing inferences might be drawn therefrom.

As stated previously, this court is unable to say that conflicting inferences might not be drawn from the facts of record in this case. For the foregoing reasons the defendants' motions for summary judgment should be, and the same are hereby DENIED.

The Clerk of the Court is directed to send a certified copy of this order to all counsel of record.