**NURSE MIDWIFERY ASSOCIATES,**
**et al.**

**v.**

**B.K. HIBBETT, M.D., et al.**

Civ. A. No. 82–3208.

United States District Court,
M.D. Tennessee,
Nashville Division.

Oct. 21, 1982.

Irwin Venick, Nashville, Tenn., for plaintiffs.

Ward Dewitt, Jr. and Andree K. Blumstein, Attys., Nashville, Tenn., for defendant, B.K. Hibbett, M.D.

W. Harold Bigham, Nashville, Tenn., and Jack R. Bierig, Chicago, Ill., for defendant, Volunteer Mut. Ins. Co., Inc.

Robert Walker and Robert Dale Grimes, Nashville, Tenn., for defendant, Vanderbilt University Hosp.

Charles L. Kown, Ames Davis and Robert E. Boston, Nashville, Tenn., for defendants, Southern Hills Hosp. and Hendersonville Community Hosp.

W. Warner McNeilly, Jr., Nashville, Tenn., for defendants, Steven Milkin, M.D., Harry Baer, M.D. and Conrad Shackleford, M.D.

## MEMORANDUM

JOHN T. NIXON, District Judge.

This is an antitrust action seeking injunctive relief and damages for alleged violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and the corresponding state statute, Tenn.Code Ann. §§ 69–101, et seq. Additional state law claims allege wrongful interference with contractual relations and violations of corporate By-Laws. This Court has jurisdiction pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and the doctrine of pendent jurisdiction. Pending are motions by defendants State Volunteer Mutual Insurance Company (SVMIC) and B.K. Hibbett, M.D., to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted.

The grounds for defendants' motions are that defendants are exempt from antitrust liability under the McCarran-Ferguson Act, 15 U.S.C. §§ 1011, et seq.,[1] and that the pendent state law claims must fall, with dismissal of the antitrust claims, for lack of subject matter jurisdiction. The only issue before this Court, therefore, is whether the action allegedly taken against plaintiffs by SVMIC and Dr. Hibbett is exempt from antitrust scrutiny under the McCarran-Fer-

---

1. The McCarran-Ferguson Act provides in relevant part:

"Sec. 2. (a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business."

"(b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Provided, that after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State Law."

"Sec. 3. (b) Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation." 59 Stat. 34, as amended, 61 Stat. 48, 15 U.S.C. §§ 1012, 1013(b) (1976 ed.).

guson Act. The merits of plaintiffs' antitrust claims are not under consideration. For the reasons set forth herein, defendants' motions are denied.

Following are the pertinent factual allegations of the complaint, construed in the light most favorable to plaintiffs and taken as true for purposes of deciding defendants' motions.

· Plaintiffs Susan Sizemore and Victoria Henderson are certified nurse midwives and principal partners of plaintiff Nurse Midwifery Associates (NMA), a professional partnership for the provision of nurse midwifery services. Plaintiff Darrell Martin, M.D., a licensed obstetrician, entered into an agreement with plaintiffs in January, 1980 for the purpose of establishing a family-centered maternity practice. According to the agreement, NMA would be a financially independent nurse midwifery practice for which Dr. Martin and his associates would provide medical supervision and services. Pursuant to the contractual arrangement, plaintiff nurse midwives sought admitting privileges at defendant hospitals,[2] and Dr. Martin sought renewal of his medical malpractice insurance policy from defendant SVMIC.

The crux of the complaint is that the defendant physicians, in order to protect their lucrative obstetrics practices in Nashville, Tennessee, sought to prevent the nurse midwives from competing with them. The defendant physicians allegedly entered into a conspiracy for the purpose of preventing plaintiffs from operating a family-centered maternity practice or offering nurse midwifery services at hospitals in the Nashville area. In furtherance of that objective the defendant physicians determined to bar plaintiff nurse midwives from obtaining hospital privileges at defendant hospitals and the supervision of a licensed physician.

The complaint alleges that in order to offer the type of maternity practice plaintiffs contemplated, a qualified obstetrician must be responsible for the medical care provided by nurse midwives. To prevent plaintiff nurse midwives' competition, therefore, defendant physicians conspired to bring pressure to bear upon Dr. Martin and any other physician who anticipated collaborative practice with the nurse midwives.

The pending motions involve one of the means defendant physicians allegedly used to impede Dr. Martin's collaboration. Defendant Dr. Hibbett and other physician co-conspirators, including members of the Underwriting Committee of SVMIC, "determined to boycott, intimidate and coerce plaintiff Martin through the concerted action of cancelling his malpractice insurance policy with SVMIC because of his contract with plaintiffs Henderson and Sizemore". Complaint, ¶ 41.

For a physician, malpractice insurance coverage is a virtual prerequisite to medical practice. Without such coverage, the physician risks personal financial exposure for damages resulting from his or her alleged negligence. SVMIC allegedly controls over 80% of the Tennessee medical malpractice insurance market. Owned and operated by its physician policyholders, SVMIC was formed during the medical malpractice crisis of the 1970's to assure the continued availability of malpractice insurance. Closely affiliated since its inception with the Tennessee Medical Association (TMA), SVMIC is governed by a Board of Directors composed of 12 physicians and 3 non-physicians, one of whom is Executive Director of the TMA. SVMIC's directors are elected by its physician policyholders. Defendant Dr. Hibbett, a member of the obstetrics staff of a Nashville hospital, became a member of the Board of Directors in May, 1980.

Paragraph 40 of the complaint states that because of its predominant position in the medical malpractice insurance market, SVMIC can influence "practice patterns of physicians and competition in the market for the delivery of health services by refusing to insure particular practice arrange-

---

**2.** Defendant hospitals and various members of their pediatrics and obstetrics staff also named as defendants have not joined in the pending motions. Among the plaintiffs are, in addition, three private clients of NMA.

ments which it finds contrary to the interests of practicing physicians and/or organized medicine." The complaint further alleges that Dr. Hibbett, although a director of SVMIC, acted on behalf of his own economic and professional interests in determining to cancel Dr. Martin's malpractice insurance policy. Pursuant to the conspiracy between Dr. Hibbett, members of the Underwriting Committee of SVMIC, and other physicians, SVMIC cancelled Dr. Martin's policy in order to injure Dr. Martin professionally and financially, to coerce him to cease his association with plaintiff nurse midwives, and thereby to restrain the nurse midwives from competing in the Middle Tennessee market for maternity services.

Allegedly as a result of defendants' actions, Dr. Martin left Tennessee to establish a medical practice in another state. Additional "effects of defendants' conspiracies" were

"to maintain higher costs for normal maternity care in the Middle District of Tennessee, to preclude child bearing couples from choosing nurse midwives as their provider of maternity services, to prohibit Henderson and Sizemore from engaging in the private practice of their profession, to restrain nurse midwives and physicians from entering into contracts for the provision of maternity service, to restrict access to hospital facilities to maternity patients utilizing physician services, and to perpetuate a monopoly by obstetricians over the provision of maternity services in Nashville, Tennessee". Complaint ¶ 52.

Plaintiff nurse midwives allegedly were unable to secure other obstetrical backup, and went out of business on December 31, 1980.

### I.

There are three prerequisites to exemption from antitrust liability under the McCarran-Ferguson Act. Within the meaning of Section 2(b) of that Act, the challenged action must constitute the "business of insurance" and, as such, must be regulated by state law; further, the conduct must not be an "agreement to" or "act of boy-

cott" within the meaning of Section 3(b). Defendants SVMIC and Dr. Hibbett argue that they are exempt from antitrust liability because the action plaintiffs challenge, the decision not to renew Dr. Martin's insurance policy, constitutes state-regulated "business of insurance" within the ambit of Section 2(b). Plaintiffs, on the other hand, contend that the defendants' conduct is not the "business of insurance", nor is it regulated by Tennessee law. Rather, the complaint states a claim within the "boycott" exception of Section 3(b) of the Act, which provides that the Sherman Act shall remain applicable "to any agreement to boycott, coerce or intimidate, or act of boycott, coercion or intimidation". 15 U.S.C. § 1013(b) (1976).

In "appraising the sufficiency of the complaint" as to the Section 3(b) boycott claim, the Court is mindful of "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief". *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Resolving every doubt in favor of plaintiffs, this Court holds that defendants SVMIC and Dr. Hibbett are not exempt under the McCarran-Ferguson Act from antitrust liability. Because the complaint states a claim within the boycott exception of Section 3(b) of the McCarran-Ferguson Act, the Sherman Act may be applicable to defendants' activity.

### II.

Plaintiffs argue that the notice of cancellation of Dr. Martin's malpractice insurance by SVMIC was the "final coercive act" in a series designed "to restrain competition between physicians and nurse midwives for the provision of maternity care". Plaintiffs' Memorandum in Opposition to Motion to Dismiss, at 9–10. Plaintiffs assert that the denial of insurance coverage constitutes a "boycott" within Section 3(b), subjecting SVMIC and its co-conspirators to the antitrust laws.

The Supreme Court in *St. Paul Fire & Marine Ins. Co. v. Barry,* 438 U.S. 531, 544, 98 S.Ct. 2923, 2931, 57 L.Ed.2d 932 (1978), addressed the question of what constitutes a "boycott" under Section 3(b) of the McCarran-Ferguson Act, concluding that Section 3(b) refers to conduct ordinarily constituting a boycott under the Sherman Act. The Court found Section 3(b) applicable to disputes between insurers and policyholders, "not limited to concerted activity against insurance companies or agents", and held that the complaint, alleging a conspiracy among four insurance companies, in which three refused to sell respondents any medical malpractice insurance as a means of compelling their submission to new terms of coverage set by the fourth, stated a claim within boycott exception. *Id.* at 552, 98 S.Ct. at 2935. Construing the terms of Section 3(b) in a manner "consistent with traditional Sherman Act usage", *id.* at 545 n. 18, 98 S.Ct. at 2932 n. 18, the Court found that the "conduct in question accord[ed] with the common understanding of a boycott." [3] *Id.* at 552, 98 S.Ct. at 2935.

At the threshold, therefore, this Court confronts the question of concerted action.[4] In order to state a claim within the McCarran-Ferguson Act's boycott exception, the complaint must sufficiently allege the concerted action necessary to state a boycott claim under the Sherman Act.

This Court must consider, first, defendants' argument that the so-called intracorporate conspiracy doctrine bars the necessary finding of a conspiracy or combination. Defendants correctly state the general rule that a corporation cannot conspire with its own employees. *See H & B Equipment Co., Inc. v. Int'l Harvester,* 577 F.2d 239 (5th Cir. 1978); *Greenville Publishing Co. v. Daily Reflector, Inc.,* 496 F.2d 391 (4th Cir. 1974). Were the rule otherwise, since a corporation can act only through its agents, the plurality requirement of Section 1 of the Sherman Act would virtually lose its meaning.

■ An exception to the rule exists, however, where the employee has an independent, personal stake in achieving the object of the conspiracy. *See Poller v. Columbia Broadcasting Co.,* 368 U.S. 464, 470, 82 S.Ct. 486, 489, 7 L.Ed.2d 458 (1962); *Morton Bldgs. of Neb., Inc. v. Morton Bldgs., Inc.,* 531 F.2d 910, 917 (8th Cir. 1976). In *Greenville Publishing Co.,* 496 F.2d at 399–400, for example, the Fourth Circuit held that the individual defendant, although director, president and stockholder, could be guilty of conspiring with the corporation. Because he would receive a percentage of the corporate revenues if they reached a certain level, the court found "an independent personal stake" sufficient to make him capable of conspiring with the firm to eliminate its competitor. *Id.*

■ The controlling consideration, then, is not the formal relationship between SVMIC and Dr. Hibbett; rather, it is whether Dr. Hibbett had an independent interest in achieving the corporation's allegedly unlawful objective. As the Supreme Court stated in *United States v. Yellow Cab Co.,* 332 U.S. 218, 227, 67 S.Ct. 1560, 1565, 91 L.Ed. 2010 (1947), an unlawful restraint

"may result as readily from a conspiracy among those who are affiliated or integrated under common ownership as from a conspiracy among those who are otherwise independent.... The corporate interrelationships of the conspirators, in other words, are not determinative of the applicability of the Sherman Act. That Act is aimed at *substance rather than form*" (emphasis supplied).

---

**3.** The *Barry* Court expressly denied, however, that its decision purported to define the entire reach of the boycott concept. *Id.* at 545 n. 18, 98 S.Ct. at 2932 n. 18. While the meaning of a § 3(b) boycott is "consistent with traditional Sherman Act usage", § 3(b)'s terms are not "coextensive with the prohibitions of the Sherman Act". *Id.* Price fixing alone, without coercive conduct, for example, would not fall within § 3(b).

**4.** Section 1 of the Sherman Act prohibits "[e]very contact, combination ... or conspiracy, in restraint of trade or commerce among the several States..." 26 Stat. 209, 15 U.S.C. § 1 (1976).

Application of the independent stake exception is appropriate here, where the alleged conspiracy was aimed not at restraining competition within the insurance industry, but at furthering the interests of physicians competing with plaintiff nurse midwives as providers of maternity care. In his capacity as an obstetrician, therefore, as distinguished from his role as director of SVMIC, Dr. Hibbett allegedly sought to obtain the agreement of the insurer not to renew Dr. Martin's insurance policy. *Cf. Carlson Mach. Tools, Inc. v. American Tool, Inc.,* 523 F.Supp. 1349, 1353 (S.D.Tex.1981), *aff'd,* 678 F.2d 1253 (5th Cir. 1982) (failure to show that defendant "had a personal stake in the object of the alleged conspiracy or was acting in a capacity other than as a corporate officer of a [division of the corporation] when defendants made the termination decision"). For purposes of these motions to dismiss, the allegation that Dr. Hibbett acted "in furtherance of his own economic and professional interests in the decision to cancel plaintiff Martin's malpractice insurance policy," provides a sufficient basis for finding the concerted action necessary to state a boycott claim.

■ Moreover, even without demonstration of an independent stake on the part of Dr. Hibbett, the existence of concerted action by a single corporation such as SVMIC is not, as a matter of law, precluded. Because SVMIC is owned and operated exclusively by its physician policyholders, who have elected a Board of Directors also dominated by physicians, and is closely affiliated with the Tennessee Medical Association, SVMIC may be considered capable of concerted action. *Hoffman v. Delta Dental Plan of Minn.,* 517 F.Supp. 564, 571 (D.Minn.1981) (corporation composed of participating dentists and subject to member control could act in concert with its members). Indeed, in view of the member control of SVMIC, SVMIC may be considered the agent of its physician policyholders. *Id.* *See also Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia,* 624 F.2d 476, 480 (4th Cir. 1980). Thus, for purposes of a boycott claim, the complaint alleges the existence of a conspiracy or combination.

■ The remaining issue is whether plaintiffs allege conduct amounting to a boycott. In applying Section 3(b) of the McCarran-Ferguson Act, the Supreme Court in *Barry,* 438 U.S. at 542–43, 98 S.Ct. at 2930, defined the "generic concept of boycott" as a "method of pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target". Plaintiffs allege that Dr. Hibbett and other physicians conspired to restrain plaintiff nurse midwives from competing with them; accordingly, Dr. Martin, as a physician collaborating with the midwives, became the target of a boycott in the form of a denial of insurance coverage by SVMIC.

Under the circumstances alleged, SVMIC's refusal to deal with Dr. Martin, "for whom medical malpractice insurance is necessary to ply [his] 'trade' of providing health care services," *Barry,* 438 U.S. at 543, 98 S.Ct. at 2930, "accords with the common understanding of a boycott." *Id.* at 552, 98 S.Ct. at 2935. As a means of ensuring Dr. Martin's submission to their attempt to prevent plaintiff nurse midwives from competing, the alleged conspirators obtained the agreement of the insurer to refuse to sell insurance to Dr. Martin. "A valuable service germane to [plaintiffs'] business and important to their effective competition with others was withheld from them by collective action." *Id.,* (quoting *Silver v. New York Stock Exchange,* 373 U.S. 341, 348–49, n. 5, 83 S.Ct. 1246, 1252 n. 5, 10 L.Ed.2d 389 (1963)).

That the pressure was applied vertically by an insurer to its customer rather than to its own competitor does not preclude a finding of a boycott in this instance. Indeed, it is "relatively rare" that a group boycott involves only traders at the same level as those seeking to compete. *Phil Tolkan Datsun v. Greater Milwaukee,* 672 F.2d 1280, 1284 (7th Cir. 1982) (quoting *Smith v. Pro Football, Inc.,* 593 F.2d 1173, 1178 n. 16 (D.C.Cir.1978)). While the "classic" boycott is the effort of a group of competitors to

protect themselves from competition from non-group members at their own level, [t]ypically, the boycotting group combines to deprive would-be competitors of a trade relationship which they need in order to enter (or survive in) the level wherein the group operates. The group may accomplish its exclusionary purpose by inducing suppliers not to sell to potential competitors...." *Smith v. Pro Football, Inc.,* 593 F.2d at 1178 (footnote omitted).

The participation of SVMIC in the efforts of a group of physicians to "barricade" themselves from competition may be a consideration in determining whether the challenged conduct falls within an "exception to the general rule that groups boycotts constitute *per se* antitrust violations". *Phil Tolkan Datsun v. Greater Milwaukee,* 672 F.2d at 1285 (applying rule of reason to trade association boycott "depart[ing] from the traditional group boycott paradigm"); *see Klor's Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 213, 79 S.Ct. 705, 710, 3 L.Ed.2d 741 (1959) (per se treatment of "wide combination consisting of manufacturers, distributors and a retailer" to exclude a retail outlet from competing with retailer); *Com-Tel, Inc. v. DuKane Corp.,* 669 F.2d 404, 414 (6th Cir. 1982) (per se rule applicable where "thrust of the [vertical restraint] was to protect [the distributor] from horizontal competition"); *United States v. Realty Multi-List, Inc.,* 629 F.2d 1351, 1365 (5th Cir. 1980) (subjecting to rule of reason real estate association's practices found "literally to constitute a group boycott"); *cf. Dos Santos v. Columbus-Cuneo-Cabrini Medical Center,* 684 F.2d 1346, 1352 & n. 9, 1982–2 Trade Cas. ¶ 64,887, at 72,475 & n. 9 (7th Cir. 1982) (rule of reason applicable to "vertical combination" in absence of conduct amounting to "classic" group boycott); *Larry V. Muko, Inc. v. Southwestern Pa.,* 670 F.2d 421, 432 (3rd Cir. 1982) (rule of reason applicable where res-

taurant's agreement not to employ non-union contractors did not constitute "classic group boycott"); Bauer, *Per Se Illegality of Concerted Refusals to Deal: A Rule Ripe for Reexamination,* 79 Columbia L.Rev. 705, 713 (May 1979) ("key inquiries ... should be the purpose or intent of the defendants and the effect of the restraint on competition," not whether the combination is vertical or horizontal). For purposes of deciding whether plaintiffs state a boycott claim under Section 3(b), however, the only issue before this Court, as in *Barry,* is "whether the conduct in question involves a boycott, not whether it is *per se* unreasonable". 438 U.S. at 542, 98 S.Ct. at 2930.

■ Nor is it fatal to a boycott claim that plaintiffs have not alleged total exclusion from the supply market for medical malpractice insurance. Defendants argue that *Barry,* 438 U.S. at 544, 98 S.Ct. at 2931, in which the agreement between the four insurers to refuse to deal with certain customers "effectively barred St. Paul's policyholders from all access to alternative sources of coverage", stands for the proposition that an insurer's refusal to deal is not a boycott if an alternative source of coverage is available. In so arguing, defendants relying primarily upon *Hahn v. Oregon Physicians Service,* 508 F.Supp. 970 (D.Ore.1981), read the *Barry* Court's factual findings to indicate a narrowing of the definition of boycott under the McCarran-Ferguson Act. Such a reading is contrary to the *Barry* Court's conclusion that the "boycott" clause refers to a concerted refusal to deal ordinarily constituting a boycott under the Sherman Act; further, the Court expressly stated that its decision did not purport to define the entire reach of the boycott concept. *Id.* at 545 n. 18, 98 S.Ct. at 2932 n. 18. An unreasonable restraint on the freedom to buy and sell in an open market—not necessarily total exclusion—is essential to the Sherman Act concept of boycott.[5] *See*

---

**5.** The availability of an alternative source of coverage may be relevant to other issues not before the Court, however, such as plaintiffs' proof of damages. Plaintiffs must, of course, prove actual injury in order to recover. *See*

*Malcolm v. Marathon Oil Co.,* 642 F.2d 845, 863 (5th Cir.), *cert. denied,* 454 U.S. 1125, 102 S.Ct. 975, 71 L.Ed.2d 113 (1981); *Trabert & Hoeffer, Inc. v. Piaget Watch Corp.,* 633 F.2d 477, 482–83 (7th Cir. 1980); *Elder-Beerman Stores Corp.*

*Klor's Inc. v. Broadway-Hale Stores, Inc.,* 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (willingness to sell only on highly unfavorable terms); *Hoffman v. Delta Dental Plan of Minn., supra,* 517 F.Supp. 572 (citing *Worthen Bank & Trust Co. v. Nat'l BankAmericard, Inc.,* 485 F.2d 119, 125 (8th Cir. 1973), *cert. denied,* 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974)) (although plaintiff was not totally excluded, "entities [were] no longer free to maintain the independence essential to a free market place" as a result of the boycott).

Defendant SVMIC and Dr. Hibbett may, of course, eventually establish that SVMIC unilaterally decided not to renew malpractice coverage for Dr. Martin solely because it believed the relationship between Dr. Martin and plaintiff nurse midwives posed an unacceptable underwriting risk to SVMIC. However, the Court cannot conclude under the pleadings that plaintiffs could not possibly adduce proof of a boycott warranting application of the antitrust laws to these defendants. The complaint alleges a concerted refusal to deal, aimed at restraining competition within the Middle Tennessee market for maternity services, that is sufficient under Section 3(b)'s boycott provision to withstand a motion to dismiss.

### III.

█ Because the Section 3(b) exception to possible McCarran-Ferguson Act exemption is applicable in this case, this Court could deny defendant's motion without considering whether the challenged activity constitutes the "business of insurance" for purposes of exemption under Section 2(b). Application of the Section 3(b) boycott exception, however, warrants denial of defendants' motions only as to Sherman Act claims of boycott or concerted refusal to deal. As the Supreme Court stated in *Barry,* 438 U.S. at 555, 98 S.Ct. at 2937, not "all concerted activity violative of the Sherman Act comes within Section 3(b)". *See also id.* at 545, n. 18, 98 S.Ct. at 2932, n. 18 (distinguishing a boycott from a claim of "price-

fixing, in the absence of additional enforcement activity"). Therefore, to the extent that the complaint states any antitrust claims that do not involve a "boycott" within the meaning of the Sherman Act, defendants could still argue that the Section 2(b) "business of insurance" exception applies to them.

Nevertheless, in light of recent decisions of the Supreme Court, particularly *Union Labor Life Ins. Co. v. Pireno,* —— U.S. ——, 102 S.Ct. 3002, 73 L.Ed.2d 647, 1982–2, Trade Cas. ¶ 64,802 (1982), this Court is not persuaded that defendants are exempt under Section 2(b). As the *Pireno* Court noted,

"in enacting the McCarran-Ferguson Act, 'the primary concern of both representatives of the insurance industry and the Congress was that cooperative ratemaking efforts be exempt from the antitrust laws'. This was so because of 'the widespread view that it [was] very difficult to underwrite risks in an informed and responsible way without intra-industry cooperation'". *Id.,* —— U.S. at ——, 102 S.Ct. at 3008, 1982–2 Trade Cas. ¶ 64,802, at 71,951 (quoting *Group Life & Health Ins. Co. v. Royal Drug,* 440 U.S. 205, 221, 99 S.Ct. 1067, 1078, 59 L.Ed.2d 261 (1979)).

Defendants' argument that the denial of insurance coverage to Dr. Martin falls within the Section 2(b) exemption presents a close question. A compelling factor in this Court's determination, however, is that defendants have not shown that the challenged conduct in any way concerns matters of "intra-industry cooperation". *Id.* To the extent that SVMIC's alleged action with respect to Dr. Martin instead involved "parties wholly outside the insurance industry", this Court is "reluctant to extend the Section 2(b) exemption to the case before it". *Id.*

In *Pireno,* the Supreme Court further articulated the standard for determining whether challenged action on the part of an insurance company is the "business of insur-

*v. Federated Department Stores, Inc.,* 459 F.2d 138, 148–49 (6th Cir. 1972).

ance" under the McCarran-Ferguson Act. The petitioner insurance company argued that Section 2(b) covered its use of a Peer Review Committee composed of ten chiropractors to determine whether particular treatments and fees were "reasonable" and "necessary", as required under policies issued. *Id.* at ——, 102 S.Ct. at 3005, 1982–2 Trade Cas. ¶ 64–802, at 71,948. Respondent, a chiropractor whose treatment and fees the Committee had deemed unreasonable, alleged that the petitioner's use of peer review was in furtherance of a conspiracy to fix prices charged by chiropractors in violation of the Sherman Act. The Supreme Court held that the insurance company was not exempt from antitrust liability because its use of the Peer Review Committee was not the "business of insurance" under Section 2(b). *Id.* at ——, 102 S.Ct. at 3010, 1982–2 Trade Cas. ¶ 64,802, at 71,953.

The *Pireno* Court identified three criteria relevant in determining whether the insurer's practice is part of the business of insurance:

> "First, whether the practice has the effect of transferring or spreading a policyholder's risk; second, whether the practice is an integral part of the policy relationship between the insurer and the insured; and third, whether the practice is limited to entities within the insurance industry". *Id.* at ——, 102 S.Ct. at 3009, 1982–2 Trade Cas. ¶ 64,802, at 71,951–52.

While "[n]one of these criteria is necessarily determinative in itself", this Court cannot conclude upon examining plaintiffs' allegations, particularly with respect to the third criterion, that the challenged action constituted the "business of insurance".

In applying the third criterion, the *Pireno* Court found it "plain" that the challenged peer review practice "inevitably involves third parties wholly outside the insurance industry—namely, practicing chiropractors". *Id.* at ——, 102 S.Ct. at 3010, 1982–2 Trade Cas. ¶ 64,802, at 71,953. While the Court assumed that Section 2(b) exemption need not be denied solely because of such involvement, the Court never-

theless observed that the involvement of third parties outside the insurance industry

> "may prove contrary to the spirit as well as the letter of § 2(b), because [it has] the potential to restrain competition in non-insurance markets. Indeed, the peer review practices challenged in the present case assertedly realize precisely this potential: *Respondent's claim is that the practices restrain competition in a provider market*—the market for chiropractic services—*rather than in an insurance market.* Thus we cannot join petitioners in depreciating the fact that parties outside the insurance industry are intimately involved in the peer review practices at issue in this case. *Id.* (emphasis supplied).

Such a restraint in a provider market is precisely the claim of plaintiffs here. By charging that certain physicians practicing in the Nashville area, including Dr. Hibbett and members of the Underwriting Committee of SVMIC, conspired with SVMIC in its refusal to deal with Dr. Martin as a means of pressuring him to withdraw his obstetrical backup from NMA, the complaint alleges a restraint on competition in a non-insurance market. The targeted marketplace was not that of medical malpractice insurance, but that of maternity services. The purpose of the Section 3(b) exemption, "primarily to protect '*intra*-industry cooperation' in the underwriting of risks", would therefore not be served by applying it to SVMIC in this context. *Pireno,* —— U.S. ——, at ——, 102 S.Ct. 3002, at 3008, 73 L.Ed.2d 647, 1982–2 Trade Cas. ¶ 64,802, at 71,951.

Nor is the Court convinced that consideration of the other *Pireno* criteria mandates a finding that the denial of coverage, under the circumstances alleged, is the "business of insurance". With respect to the first criterion, the question is a closer one. Certainly, as defendants argue, a denial of coverage is related to the "underwriting or spreading of risk", which is the hallmark of insurance. *Royal Drug,* 440 U.S. at 211–12, 99 S.Ct. at 1073. A transfer of risk "is effected by means of the contract between

the parties—the insurance policy." *Pireno,* —— U.S. at ——, 102 S.Ct. at 3010, 1982–2 Trade Cas. ¶ 64,802, at 71,952. Arguably, the converse situation, a refusal to transfer a risk, would be a concomitant part of the business of insurance.

Defendants have not conclusively shown, however, in view of the *Pireno* Court's application of the second criterion, that the challenged denial is "an integral part of the policy relationship between insurer and insured". *Id.* The *Pireno* Court again observed, in concluding that defendants' review practice was not such an integral part, that use of the Committee involved "third parties not engaged in the business of insurance". *Id.* The Court, in addition, rejected the argument that peer review "directly involves the 'interpretation' and 'enforcement' of the insurance contract", finding that the insurer's use of the Committee "in its decisionmaking process is a matter of indifference to the policyholder, whose only concern is *whether* his claim is paid, not *why* it is paid." *Id.* at ——, 102 S.Ct. at 3010, 1982–2 Trade Cas. ¶ 64,802, at 71,953 (emphasis in the original). The complaint at issue here alleges that members of the Board of SVMIC, policyholders, and other physicians influenced SVMIC's decision not to renew Dr. Martin's policy. To this extent, as in *Pireno,* third parties outside the insurance industry were involved in the decisionmaking process.

This Court cannot conclude, for purposes of these motions to dismiss, that the process by which SVMIC, allegedly in concert with the physicians, decided not to continue its policy relationship with Dr. Martin is so plainly the "business of insurance" as to require Section 2(b) exemption. To hold otherwise would mean that the challenged denial of coverage should be exempted from antitrust scrutiny as part of the business of insurance even if, as plaintiffs allege, it was made solely to apply pressure upon the customer in order to secure his compliance with anticompetitive behavior in a non-insurance market. It is not the business of insurance to use coverage "as a coercive lever ... in order to compel certain dealings in a non-insurance product or service".

*Zelson v. Phoenix Mut. Life Ins. Co.,* 549 F.2d 62, 67 (8th Cir. 1977). The complaint alleges that defendants' actions "impinge upon competitive forces in the non-insurance market", the health care market for maternity services. *Id.* Under the criteria enunciated in *Pireno,* the alleged activities are not readily characterizable as the business of insurance.

Moreover, as the *Pireno* Court observed, the Supreme Court's "precedents consistently hold that exemptions from the antitrust laws must be construed narrowly. This principle applies not only to implicit exemptions, but also to express statutory exemptions." *Pireno,* —— U.S. at ——, 102 S.Ct. at 3006, 1982–2 Trade Cas. ¶ 64,802, at 71,950 (citations omitted). Defendants have not demonstrated to the degree of certainty required on a motion to dismiss that the challenged conduct is the business ·of insurance within the meaning of the Section 2(b) exemption. *See Zelson,* 549 F.2d at 66.

### IV.

When the challenged action is not the "business of insurance", or when Section 3(b) applies, providing an exception to Section 2(b) exemption that would otherwise be available, the Court need not consider whether the challenged conduct is "regulated by State Law" within the meaning of Section 2(b). *See Royal Drug,* 440 U.S. at 210 n. 4, 99 S.Ct. at 1072 n. 4. Resolution of the question of State regulation, rather, would be necessary in the event that the Court found that the challenged conduct constituted the "business of insurance". *See Ohio AFL–CIO v. Insurance Rating Board,* 451 F.2d 1178 (6th Cir. 1971), *cert. denied,* 409 U.S. 917, 93 S.Ct. 215, 34 L.Ed.2d 180 (1972). Because the Court has not reached this conclusion on defendants' motions to dismiss, resolution of the question of state regulation is unnecessary at this time.

### V.

Finally, as to the pendent state claims, defendants' motions to dismiss are condi-

tioned on this Court's granting defendants' motions on the antitrust claims. Because the motions have been denied with respect to the federal claims, this Court retains jurisdiction over the pendent claims.

For the foregoing reasons, defendants' motions have been denied pursuant to an ORDER entered on August 26, 1982, prior to the entering of this amended Memorandum of Law.