TRIDENT NEURO–IMAGING LABORATORY, Albert F. Aiken, M.D., O. Rhett Talbert, M.D., Thomas H. Dukes, M.D., CT Scanlab, James Harrell, and John Mizzell, Plaintiffs,

v.

BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA, INC., Defendant.

Civ. A. No. 81–1639–1.

United States District Court, D. South Carolina, Charleston Division.

Aug. 5, 1983.

Wade H. Logan, III, Charleston, S.C., and J. Marbury Rainer and John H. Parker, Jr., Atlanta, Ga., for plaintiffs.

Charles W. Knowlton and Manton M. Grier, Columbia, S.C., for defendant.

## ORDER

HAWKINS, District Judge.

This matter is before the court on defendant Blue Cross and Blue Shield of South Carolina, Inc.'s motion for summary judgment. The plaintiff instituted this action in July 1981, seeking damages and injunctive relief. Plaintiff Trident Neuro-Imaging Laboratory (Trident) is a South Carolina general partnership; the plaintiffs Albert F. Aiken, M.D., O. Rhett Talbert, M.D. and Thomas H. Dukes, M.D. are its partners. CT Scanlab is a North Carolina limited partnership, and James Harrell and John Mizzell are patients of one of the two scanlabs who have contracts of insurance with Blue Cross and Blue Shield of South Carolina, Inc. (Blue Cross). Both partnership plaintiffs consist of physician partners and are physician-directed "private" clinics which own, operate and use devices known as CAT scanners in rendering CAT scans and interpretations thereof to patients who have health and medical insurance with Blue Cross. Trident is located in North Charleston, South Carolina, and CT Scanlab is located in Charlotte, North Carolina.

The defendant Blue Cross is a private insurance corporation which contracts with policyholders and others to provide third party payment directly to health care providers for various health and medical services rendered by doctors, hospitals, clinics and other health care providers. If direct reimbursement is not paid to the provider, then Blue Cross may reimburse the policyholder directly for health care provided.

The former defendant Palmetto Low-country Health Systems Agency (PLHSA) is a nonprofit regional Health Systems Agency (HSA) established pursuant to the National Health Planning and Resources Development Act of 1974 (NHPRDA) (Public Law 93–641), 42 U.S.C. § 300k, *et seq.*, and state enabling legislation. PLHSA was designated as an HSA on April 29, 1976. By order dated November 2, 1982, this court granted summary judgment to defendant PLHSA.

The plaintiffs' complaint seeks damages and injunctive relief. Count I of the complaint alleges violations of §§ 4 and 16 of the Clayton Act (15 U.S.C. § 15) and § 1 of the Sherman Act (15 U.S.C. § 1) by Blue Cross, alleging a conspiracy by Blue Cross and other unnamed co-conspirators in restraint of trade. Count II of the plaintiffs' complaint alleges violations of the South Carolina statutes regarding trusts, monopolies and restraints of trade, specifically S.C. Code §§ 39–3–10, 39–3–120, 39–3–130, 39–3–140, and the South Carolina Unfair Trade Practices Act (S.C.Code § 39–5–20). Count III of the complaint alleges a breach of contract by Blue Cross.

The case at bar involves Computerized Axial Tomography scanners (CAT scanners). Computerized axial tomography, labeled the first revolutionary innovation in radiology, is a procedure whereby a machine known as a scanner obtains x-ray images of cross sections of the head or body (tomography). These images are reconstructed from numerous angles (axial) mathematically into three dimensions (by computer). Reconstructions can be displayed on a television screen from which photographic prints may be made for medical records or presented in digital form. Plaintiffs' contention is that Blue Cross conspired with others to restrain trade by preventing or impairing the ability of physicians with CAT scanners to compete with hospitals in providing CAT scanning services.

Blue Cross has moved for summary judgment on the federal antitrust claim on two distinct grounds: (1) that there is no evidence creating an issue of antitrust conspiracy; and (2) that Blue Cross is exempt from antitrust liability under the McCarran-Ferguson Act (15 U.S.C. § 1011, *et seq.*). Summary judgment may be granted where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Kendall Elevator Co., Inc. v. LBC & W Assoc. of S.C., Inc.*, 350 F.Supp. 75 (D.S.C.1972).

## I. EVIDENCE OF ANTITRUST CONSPIRACY

Plaintiffs' position is that the evidence shows that Blue Cross conspired with PLHSA and other health planning agencies, the Health Care Financing Administration (HCFA) of the Department of Health and Human Services, hospitals with CAT scanners, hospital-based physicians (most notably radiologists), and Blue Cross and Blue Shield Association (BCA) to restrain trade in the market of CAT scanning, and attempted to prevent the acquisition of CAT scanners by private physicians.

Citing to numerous depositions and documents, the plaintiffs have substantiated, for the purposes of this summary judgment motion, their theory of conspiracy. This court has studied the evidence at length and concludes that there is sufficient evidence from which to draw reasonable inferences of the existence of a conspiracy as outlined by the plaintiffs.

To illustrate, BCA paid for the CAT scan study conducted by the Institute of Medicine, which discouraged the acquisition of CAT scanners by physicians and recommended that insurers not reimburse for scans performed on physician-owned machines. This report was relied on by PLHSA in adopting its recommendation that insurers not reimburse for CAT scans done on physician-owned scanners. Judge Simons has ruled in *Starnes v. Harris*, No. 79–2311–6 (D.S.C. Mar. 6, 1980), that Blue Cross acted in concert with HCFA and others to formulate a ceiling for Medicare reimbursement for CAT scans performed on physician-owned machines when no such limitation on reimbursement was placed on CAT scans on hospital-owned scanners. The existence, make-up, and discussions of

the "CAT discussion group" called by the South Carolina Department of Health and Environmental Control (DHEC) give rise to inferences of a joint effort to prevent physician-owned scanners. There is evidence from which to infer that Blue Cross worked with hospitals and hospital administrators to prevent the acquisition of CAT scanners by physicians (see affidavit of Michael L. Hodge). Further, the evidence as submitted indicates that Blue Cross never imposed any limit on the level of hospital reimbursement for CAT scans. As stated by the plaintiffs, each of the alleged conspirators had an economic or other express interest in preventing physician-owned CAT scanners. Whether these persons or organizations joined in a conspiracy to carry out the mutual interest of the group is a question of fact that will have to be decided at trial.

In a memorandum supporting the motion for summary judgment and at oral argument, Blue Cross has attempted to narrow the scope of alleged conspiracy to the activities of the "CAT discussion group," as those participants in the DHEC meeting are known. Plaintiffs' position is that the meeting was only one act in furtherance of the overall conspiracy, and plaintiffs have supported their position for the purposes of this motion.

■ The antitrust plaintiff, when faced with a summary judgment motion, must merely offer significant probative evidence to support its case.

If reasonable inferences drawn from all of the evidence—which must be viewed in the light most favorable to the plaintiff— indicate the existence of a conspiracy, the plaintiff has introduced a sufficient basis for proceeding to trial. *See Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464 [82 S.Ct. 486, 7 L.Ed.2d 458] (1962). The ultimate inference that a

conspiracy existed need not be more probable than the inference that the refusal to deal resulted from independent business judgment.

*Southway Theatres, Inc. v. Georgia Theatre Co.,* 672 F.2d 485, 495 (5th Cir.1982). When viewing a conspiracy such as is involved in this case, the conspiracy must be judged, not by looking at its various distinct parts, but only by looking at it as a whole.

Conspiracies may be implied from a course of dealing and other circumstances [citation omitted]. Moreover, this case involves elusive questions concerning the moving defendants' intentions and motives, which are questions that should seldom be disposed of by summary procedure.

*Ohio ex rel. Brown v. Mahoning County Medical Society,* 1980–1 Trade Cases ¶ 63,-100, p. 77,505 (N.D.Ohio 1979).

■ The facts and evidence in this case permit the inference that Blue Cross conspired with numerous parties to boycott and prevent the acquisition of CAT scanners by private physicians and to otherwise restrain trade in the CAT scanning market. Regardless of Blue Cross' denial that a conspiracy existed, the evidence before this court of the close contacts and contractual relations between Blue Cross and the alleged co-conspirators, the actions of those parties, and the motives of the alleged co-conspirators to boycott physician-owned scanners give rise to an inference that all embraced the conspiracy. *See Feminist Women's Health Center, Inc. v. Mohammad,* 586 F.2d 530, 548–49 (5th Cir.1978); *Ballard v. Blue Shield of Southern West Virginia,* 529 F.Supp. 71 (S.D.W.Va.1981).[1]

■ Given the general principle that summary disposition of antitrust conspiracy cases is not favored, especially when there are competing inferences which may be

---

1. Blue Cross relies on two cases from the Second Circuit Court of Appeals to support its position that it is entitled to a summary judgment on the conspiracy issue. Neither case is applicable since both determined that no conspiracy existed after a full review of the evidence presented at trial and the peculiar circumstances of the industries and relationships

involved. In *Oreck Corp. v. Whirlpool Corp.* 639 F.2d 75 (2d Cir.1980), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1982), the court affirmed a directed verdict, and in *Venture Technology, Inc. v. National Fuel Gas Co.,* 685 F.2d 41 (2d Cir.1982), the court reversed a jury verdict.

drawn from the evidence and questions exist concerning the defendant's motives and intent, this is simply not a case which is appropriate for summary disposition. As the Supreme Court stated in the landmark case *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962):

> We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot.

*Id.* at 473, 82 S.Ct. at 491.

### II. McCARRAN–FERGUSON ACT

■ Blue Cross also argues that, as a matter of law, summary judgment should be granted as Blue Cross is protected by the McCarran-Ferguson Act, 15 U.S.C. § 1011, *et seq.,* which exempts from the antitrust laws, including the Sherman Act, the business of insurance, which is regulated by the state and which does not constitute an act of boycott, coercion, or intimidation.

The plaintiffs concede that Blue Cross is regulated by the state, but argue that the act complained of is not the "business of insurance." In addition, plaintiffs argue that their claim is within the "boycott" exception of Section 3(b) of the Act, which provides that the Sherman Act shall remain applicable "to any agreement to boycott, coerce or intimidate, or act of boycott, coercion or intimidation." 15 U.S.C. § 1013(b). The issue is whether the plaintiffs have provided sufficient evidence of conduct amounting to a boycott to withstand a summary judgment motion.

### A. Conduct Amounting to Boycott

In *St. Paul Fire & Marine Ins. Co. v. Barry,* 438 U.S. 531, 98 S.Ct. 2923, 57 L.Ed.2d 932 (1978), the Supreme Court construed the language of § 3(b) as adopting the traditional concept of a boycott: namely, a target of the boycott and a concerted refusal to deal with the target. Blue Cross would argue that there must be a refusal to deal *on any terms* by members of the boycott, thus, there is no boycott in the instant case because, on some Blue Cross policies,

the plaintiffs are reimbursed. Further, Blue Cross points out, other private insurers and Medicare provide the coverage for CAT scans performed in physicians' offices. Blue Cross also points out that it does not compete in the relevant market, a requirement it says is necessary for a relevant boycott.

■ The generic concept of boycott is a "method of pressuring a party with whom one has a dispute by withholding, or enlisting others to withhold, patronage or services from the target." *Barry,* 438 U.S. at 542, 98 S.Ct. at 2930. In the present case, under the facts alleged, Blue Cross' partial refusal to deal with plaintiffs, for whom reimbursement is important in providing health care services, "accords with the common understanding of boycott." *Barry,* 438 U.S. at 552, 98 S.Ct. at 2935. As a means of ensuring plaintiffs' submission to their attempt to prevent them from operating a physician-owned CAT scanner, the alleged conspirators convinced Blue Cross to refuse to reimburse plaintiffs. A valuable service germane to plaintiffs' business and important to their effective competition with others was withheld from it by collective action.

■ Further, as the *Hibbett* court ruled, an unreasonable restraint on the freedom to buy and sell on the open market—not necessarily total exclusion—is essential to the Sherman Act concept of boycott. *Nurse Midwifery Associates v. Hibbett,* 549 F.Supp. 1185, 1191–92 (M.D.Tenn.1982).

The plaintiffs rely on *Ballard v. Blue Shield of West Virginia,* a Fourth Circuit case which involved the refusal of the Blue Shield plan to reimburse for chiropractic services. The Fourth Circuit held that the allegation that Blue Shield's policy restrained trade by making chiropractic services unattractive was sufficient to come within the scope of 15 U.S.C. § 1013(b) for purposes of withstanding a motion to dismiss. *Ballard v. Blue Shield of West Virginia,* 543 F.2d 1075 (4th Cir.1976). On remand, on motion for summary judgment, the district court refused to hold that a boycott within the meaning of the Act

could not be proved and denied summary judgment.

This court is of the opinion that whether or not a boycott has existed or exists presently is a question of fact going directly to the merits of the plaintiffs' case. Quite simply, if a boycott exists or has existed in the past, the plaintiffs may prevail before a jury and recover damages accordingly. Conversely, if there is or has been no boycott the plaintiffs will have failed to prove their case and the defendants will prevail without need for invoking the McCarran-Ferguson exemption. In short, by alleging a boycott, plaintiffs have precluded further inquiry regarding this exemption and must now be put to their proof.

The existence or non-existence of a boycott remains a genuine issue of material fact to be resolved herein and summary judgment is manifestly inappropriate.

Over a six-year period, the court file in this action has become voluminous, and this court is unable to say that a jury might not draw differing inferences regarding the existence of a boycott. Indeed, documents submitted by the plaintiffs tend to indicate an anti-chiropractic bias on the part of the leadership of the American Medical Association. The factual materials in the record do not necessarily preclude plaintiffs' establishing at trial some nexus between the A.M.A. and one or more of the named defendants with regard to this anti-chiropractic attitude. Should such a nexus be established, a jury could find that there was concerted action among one or more defendants and the A.M.A. to boycott the chiropractic profession.

The casebooks are replete with admonitions against the granting of summary judgment in complex antitrust cases involving intent and motive. (See 10 Wright and Miller, Federal Practice and Procedure § 2730).

.    .    .    .    .

The case at bar seems to be a classic example of a situation in which there may be little dispute as to the facts, but great disagreement as to the inferences which might conceivably be drawn therefrom. The record before the court abounds with documents, depositions and interrogatories which, taken together, constitute a set of facts about which there is little dispute. Summary judgment, under these circumstances, will nevertheless be improper because it appears that these undisputed facts might yield conflicting inferences.

*Ballard v. Blue Shield of Southern West Virginia,* 529 F.Supp. 71, 74–75 (S.D.W.Va. 1981).

Because the § 3(b) exception to possible McCarran-Ferguson Act exemption is applicable in this case for the purpose of this motion, this court could deny Blue Cross' summary judgment motion on this ground without considering whether the challenged activity constitutes the "business of insurance" for purposes of exemption under § 2(b). Application of the § 3(b) boycott exception, however, warrants denial of Blue Cross' motion only as to the Sherman Act claims of boycott or concerted refusal to deal. To the extent that the complaint states any antitrust claims that do not invoke a boycott within the meaning of the Sherman Act, Blue Cross could still argue that the § 2(b) "business of insurance" exception applies to it.

### B. The Business of Insurance

The issue becomes whether or not the decision by Blue Cross not to reimburse policyholders for CAT scans performed outside hospitals is the business of insurance.[2]

The Supreme Court in *Union Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 102 S.Ct. 3002, 73 L.Ed.2d 647 (1982), re-examined the three basic elements used to determine what is the "business of insurance" that were first set forth in *Group Life and Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 99 S.Ct. 1067, 59 L.Ed.2d 261 (1979).

**2.** It should be noted that it is plaintiffs' contention that Blue Cross' decision not to reimburse

for physician-owned CAT scans was only one aspect of the overall illegal conduct.

In sum, *Royal Drug* identified three criteria relevant in determining whether a particular practice is part of "the business of insurance" exempted from the antitrust laws by § 2(b): *first,* whether the practice has the effect of transferring or spreading of a policyholder's risk; *second,* whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third,* whether the practice is limited to entities within the insurance industry. None of these criteria is necessarily determinative in and of itself . . . .

*Pireno,* 458 U.S. at 129, 102 S.Ct. at 3009. These will be discussed separately.

(1) *Whether the practice has the effect of transferring or spreading of a policyholder's risk.*

"It is characteristic of insurance that a number of risks are accepted, some of which involve losses, and that such losses are spread over all the risks so as to enable the insurer to accept each risk at a slight fraction of the possible liability upon it." G. Couch, Encyclopedia of Insurance Law, § 1:3 (2d Ed.1959). Blue Cross classifies the underwriting decision made as the decision, in part, to exclude the "risk of CAT scans performed on a hospital scanner" is transferred to Blue Cross and spread over all its subscribers.

Plaintiffs, on the other hand, contend that the underwriting decision made by Blue Cross was to reimburse for all medically necessary CAT scans, since any policyholder in need of a scan could obtain reimbursement for a CAT scan by going to a hospital with a scanner. Thus, the decision NOT to reimburse physician-owned scanners was made to discourage the acquisition of CAT scanners and was not an underwriting decision.

A study of relevant case law is revealing. In *Royal Drug,* the Texas Blue Shield Plan offered policies which entitled insureds to purchase prescription drugs for two dollars from pharmacies participating in "Pharmacy Agreements" with Blue Shield. Nonparticipating pharmacies alleged pricefixing and a boycott. The Supreme Court ruled that Blue Shield was not protected from liability by the McCarran-Ferguson Act. The Court found no "underwriting of risk" involved in the decision to offer the "Pharmacy Agreement" benefit to insureds because Blue Shield had already accepted the risk of paying for an insured's prescription. The Supreme Court in *Pireno* reviewed the use of a chiropractic peer review committee by insurance companies to determine whether chiropractic charges were reasonable. The Supreme Court found the arrangement in question did not involve the spreading of risk. As explained by the Second Circuit, whose opinion was affirmed by the Supreme Court, peer review merely *measures the extent* to which a policyholder has failed to effect such a transfer of risk (i.e., the cost of chiropractic service). *Pireno v. New York State Chiropractic Ass'n,* 650 F.2d 387, 393 (1981). The *Pireno* Supreme Court found the use of the peer review committee to be a form of cost reduction and *not* the spreading of risk. *Pireno,* —— U.S. at ——, 102 S.Ct. at 3009.

A Tennessee district court refused to dismiss an action brought by midwives against a medical insurance company for refusing to provide malpractice coverage. Using the *Pireno* analysis, the court in *Nurse Midwifery Associates v. Hibbett,* 549 F.Supp. 1185 (M.D.Tenn.1982), undertook an analysis of the insurance company's decision to refuse to cover midwives in order to determine if it were made a part of the "business of insurance." There, the judge felt that the denial of coverage *was* related to the underwriting or spreading of "risk," saying that if transferring risk is the "business of insurance," then the converse process, a refusal to transfer a risk, would also be a part of insurance. *Id.* at 1194. Compare *Pireno,* where the Second Circuit said "an activity of procedure that does not either transfer risk from insured to insurer or spread the risk among insureds is *not* the business of insurance." *Pireno,* 650 F.2d at 393. However, the court in *Hibbett* applied the other two criteria of the "business of insurance" to the facts and found this refusal to insure *not* to be covered by the McCarren-Ferguson Act for the purpose of the dismissal motion.

In *Hahn v. Oregon Physicians' Service*, 508 F.Supp. 970 (D.Or.1981), the district court granted summary judgment for the defendant health insurers in an anti-trust action where plaintiffs alleged that the insurers had conspired to boycott podiatrists' services in favor of licensed physicians by not providing insurance coverage. The district court in examining the "risk-spreading" criteria found that:

In my view, the qualifications of physicians, podiatrists, and other members of the healing arts, and the nature and extent of the services such persons may perform, are essential elements in the risk which health care insurance companies may legally define. Therefore, the defendants were privileged to determine that the care provided by podiatrists increased the risk over that of an M.D., for the same type of service. This is particularly true in Oregon, where there is no equality statute.

I therefore hold that the decision of the defendants to limit their risk by imposing restrictions on podiatric care insurance qualifies as the "business of insurance" for purposes of the McCarran-Ferguson Act.

*Id.* at 975.

On appeal, the Ninth Circuit held that the record did not support the district court's decision and therefore reversed the district court in *Hahn v. Oregon Physicians' Service*, 689 F.2d 840 (9 Cir.1982). While the opinion primarily focused on the third criteria set forth in *Royal Drug* and *Pireno,* the court stated: " ... the defendants have introduced no evidence tending to establish there were bona fide risk-related reasons to distinguish between the services of M.D.'s and podiatrists ...." *Id.* at 843.

Finally, the Fourth Circuit, in *Virginia Academy of Clinical Psychologists v. Blue Shield of Virginia*, 624 F.2d 476 (4th Cir. 1980), *cert. denied,* 450 U.S. 916, 101 S.Ct. 1360, 67 L.Ed.2d 342 (1981), decided a Sherman Act case brought by psychologists against Blue Shield for its refusal to reimburse insureds for services rendered by clinical psychologists unless the services were billed through a physician. The court held that the defendants' activities were not the

"business of insurance." *Id.* at 483–84. The court recognized that the insurers had already made the underwriting decision to cover these mental and nervous disorders in their policies. "Their decision regarding psychologists was not whether to underwrite the risk of those disorders or even the need for psychotherapy; rather it was a question of *who* [sic] they would pay for such services." *Id.* at 484. The court therefore decided that the defendants' actions did not fall within the traditional meaning of the "business of insurance" but rather related to the cost of carrying out their contractual obligation.

Thus, cases since *Royal Drug* seem to hold that only the core activities of a traditional insurance company, *viz.,* the underwriting and risk spreading functions, fall within the McCarran-Ferguson Act exemption for the business of insurance.

Applying that approach to the facts at hand, this court concludes that Blue Cross' decision not to reimburse for physician-owned scanners is not an underwriting decision but rather a cost reduction decision as explained by the plaintiffs. Thus, Blue Cross fails to qualify for the first criteria of the "business of insurance."

(2) *Whether the practice is an integral part of the policy relationship.*

Although Blue Cross' reimbursement policy with regard to CAT scans was adopted on January 23, 1977, and applied to all claims received thereafter, the policy was not incorporated into many contracts even as late as April 26, 1979. Further, in *Virginia Academy,* although the payment policy was clearly included in the contracts, the Fourth Circuit concluded:

The essence of the business of insurance is the relationship between the insurance company and its policyholder. [Citations omitted]. We are persuaded that the defendants' policy regarding payment of clinical psychologists is only tangential to that relationship in that it does not affect the benefit conferred upon the subscriber.

*Id.* at 483. The Virginia Blue Shield policy would not reimburse a policyholder who went directly to a psychologist. In order to

obtain reimbursement, a policyholder would have to go to a physician who would then presumably refer the patient, then handle the billing for the treatment rendered by the psychologist. The Fourth Circuit did not feel this policy affected the benefit conferred on the subscriber. It seems certain that the Fourth Circuit would feel the same way about Blue Cross' policy not to reimburse for CAT scans taken on physician-owned instruments.

(3) *Whether the practice is limited to entities within the insurance industry.*

It is clear that Blue Cross' refusal to reimburse for physician-owned scanners inevitably involves third parties wholly outside the insurance industry—namely neurologists. As noted in *Royal Drug* (and quoted in *Pireno*), § 2(b) was intended primarily to protect "intra-industry cooperation in the underwriting of risks." 440 U.S. at 221, 99 S.Ct. at 1078. The plaintiffs claim is that Blue Cross' practices restrain competition in a provider market—the market for neurological reading of CT scans—rather than the insurance market. *Royal Drug, Pireno,* and *Hahn,* all support this analysis. Further, the plaintiffs have alleged that hospital physicians and others influenced Blue Cross' decision not to reimburse. To that extent, third parties outside the insurance industry were involved in the decision-making process. Blue Cross cites *Anglin v. Blue Shield of Virginia,* 693 F.2d 315 (4th Cir. 1982), for support in saying that Blue Cross meets this third criteria; however, *Anglin* dealt with the refusal of Blue Shield to offer the plaintiff a policy which would cover his child but would not require coverage for his wife. That refusal was certainly an insurance decision. The plaintiffs were policyholders whose alleged injury concerned only Blue Shield's relations with its policyholders and had no direct effect on a specific health care provider. It is evident under the facts of the case at bar that Blue Cross does not meet the third criteria.

To summarize, Blue Cross' decision not to reimburse for physician-owned scanners does not constitute the "business of insurance" within the meaning of § 2(b) of the McCarran-Ferguson Act. As the district court said in *Hibbett,*

This Court cannot conclude, for purposes of these motions to dismiss, that the process by which SVMIC, allegedly in concert with the physicians, decided not to continue its policy relationship with Dr. Martin is so plainly the "business of insurance" as to require Section 2(b) exemption. To hold otherwise would mean that the challenged denial of coverage should be exempted from antitrust scrutiny as part of the business of insurance even if, as plaintiffs allege, it was made solely to apply pressure upon the customer in order to secure his compliance with anticompetitive behavior in a non-insurance market. It is not the business of insurance to use coverage "as a coercive lever . . . in order to compel certain dealings in a non-insurance product or service." (citation omitted)

*Hibbett,* 549 F.Supp. at 1194. Summary judgment is denied as a matter of law on the ground that Blue Cross is exempt from liability did not result from the "business of insurance," therefore, Blue Cross is not entitled to the protection afforded by the Act.

## III. BLUE CROSS' MOTION FOR SUMMARY JUDGMENT ON THE STATE LAW CAUSES OF ACTION

As to the allegations of state antitrust violations, this court has previously held that under Count II there is no private right of action under the state antitrust statutes. Blue Cross is also exempt from liability under the Unfair Trade Practices Act, which has been allegedly violated by Blue Cross. The activities of Blue Cross are regulated by the Insurance Commission under Title 38 of the South Carolina Code. The Unfair Trade Practices Act does not apply to "transactions permitted under laws administered by any regulatory body . . . ." S.C.Code Ann. § 39–5–40(a) (1976), *see State ex rel. McLeod v. Rhoades,* 275 S.C. 104, 267 S.E.2d 539 (1980). As the South Carolina Commission on Insurance approved Blue Cross' exclusion of coverage on physician-owned CAT scans, § 39–5–40(g) acts to exempt Blue Cross from Unfair Trade Practice claims.

Count III alleges contract claims by the individual plaintiffs, subscribers to Blue Cross policies. As summary judgment has been denied on the federal claims, this court will continue its pendant jurisdiction over these common law claims.

Based on the above, it is, therefore,

ORDERED, that the defendant Blue Cross' motion for summary judgment be, and the same is hereby, granted only as to the state antitrust and Unfair Trade Practice causes of action (designated as Count II in the complaint), and that its motion for summary judgment as to the federal antitrust cause of action and the contract cause of action (designated as Counts I and III in the complaint) be, and the same is hereby, denied.

AND IT IS SO ORDERED.