Corey T. **WELCHLIN, D.O. and Richard W. Banks, D.O. on behalf of themselves and all others similarly situated, Plaintiffs,**

v.

**TENET HEALTHCARE CORPORATION, d/b/a Hilton Head Medical Center and Clinics, a/k/a/ Hilton Head Hospital; et al., Defendants.**

No. 9:03–3162–23.

United States District Court,
D. South Carolina,
Beaufort Division.

April 19, 2005.

Gerald E. Deloss, Myra V. Whitener, Charleston, SC, for Plaintiffs.

Stuart Murray Andrews, Jr., Travis Dayhuff, Celeste Tiller Jones, Jane W. Trinkley, Columbia, SC, for Defendants.

DUFFY, District Judge.

This matter is before the court upon Defendants' Motion for Summary Judgment. For the reasons set forth herein, Defendants' motion is denied.

## BACKGROUND

Plaintiffs, two osteopathic physicians, on behalf of themselves and all others similarly situated,[1] sued the various Defendants here claiming they were denied privileges to practice at the Hilton Head Regional Medical Center ("the Medical Center"). More specifically, Plaintiffs allege that the Defendants conspired to limit or prevent osteopathic practitioners from practicing at the Medical Center by adopting a bylaw that required physicians seeking hospital privileges to be certified or eligible for certification by a board recognized by the American Board of Medical Specialties ("ABMS").[2] Osteopathic physicians such

---

1. While Plaintiffs still caption their pleadings as "on behalf of themselves and all others similarly situated," the court denied Plaintiffs Motion for Class Certification on March 25, 2004.

2. In order to obtain staff privileges, the bylaw required:

Current certification and/or re-certification, without restriction, by the appropriate medical specialty board(s) recognized by the American Board of Medical Specialties, applicable to these Practitioner's Clinical Privileges, or to be eligible at the time of application for such certification and/or re-

as the Plaintiffs are certified by boards recognized by the American Osteopathic Association (AOA), not the ABMS.[3] Plaintiffs suggest that the effect of the bylaw is to prevent osteopathic physicians with "true osteopathic" education and training, or those osteopaths who receive their education and training at osteopathic medical schools and facilities, from obtaining privileges at the Medical Center. Further, Plaintiffs contend that Defendants have limited their ability to retain new patients. (Sec.Am.Comp.¶ 26).

Plaintiffs applied for appointment to the Medical Center's staff in January of 2002, and their applications were returned the next month. Shortly thereafter, Plaintiffs resubmitted their applications. In October of 2002, Defendant Dennis Bruns, CEO of the Medical Center, sent a letter to Plaintiffs informing them that their applications were returned because of the bylaw requirement that they be certified or eligible for certification by an ABMS-recognized board. Defendants contend that they offered Plaintiffs a chance to prove that their certifications were equivalent to ABMS-recognized board certifications, but that Plaintiffs have failed to submit adequate evidence of substantial equivalence in support of their applications. Defendants suggest that instead of presenting this evidence, Plaintiffs instigated the present lawsuit, alleging the following claims: (1) violation of the Sherman Antitrust Act, 15 U.S.C. § 1 (Count One); (2) violation of the South Carolina Antitrust Act (Count Two) (3) tortious interference with contractual relationships (Count Three); (4) violation of the South Carolina Unfair Trade Practices Act (Count Four); and (5) civil conspiracy. Plaintiffs contend, on the other hand, that they have submitted overwhelming evidence of the equivalence of DOs and MDs which Defendants have failed to consider. (Pl. Supp. Mem. at 4–16; Sec. Am. Comp. ¶ 26).

Defendants filed an earlier motion to dismiss or for summary judgment, which this court granted in part on July 1, 2004. The court dismissed Plaintiff's claim for civil conspiracy, but denied Defendants' motion on all other causes of action.[4] Thus, four causes of action remain—Plaintiffs' state and federal antitrust claims (Counts One and Two), tortious interference with contractual relationships (Count

---

certification and to obtain such certification or recertification within five years of eligibility.

There is great dispute about when the bylaw, in this form, was adopted. In a Supplemental Memorandum filed with the court, Plaintiffs contend that the bylaw requirement of ABMS certification was not added until 1990, see Pl. Supp. Mem. at 4, while Defendants argue that the provision has been in place over twenty years. (Def. Reply. at 8) ("[I]t is undisputed that the ABMS bylaw was adopted over twenty years ago...."). From the record, it does appear that the bylaw was not in existence in its present form, including the ABMS requirement, until 1990.

3. Plaintiffs contend that the AOA and ABMS meet the same standards as educational, accrediting, and approval bodies.

4. The court dismissed this civil conspiracy claim on the grounds that under controlling law, for a common law conspiracy claim (unlike a federal antitrust claim), Plaintiffs had to demonstrate "specific intent to injure a particular plaintiff." See Whitfield v. John Bourne Co., 16 Fed.Appx. 116, 124–25, 2001 WL 845137, *7 (4th Cir.2001). Here, because the bylaw was enacted before Plaintiffs applied for appointment to the medical staff, Plaintiffs could not prove this action was taken with specific intent to injure them.

Notably, in Whitfield, the Court also rejected the plaintiff's attempt to parallel civil conspiracy and antitrust law, as the former required a more elevated standard of proof under South Carolina law. Accordingly, this court's prior ruling on Plaintiffs' civil conspiracy claim has little import on the viability of the antitrust claims.

Three), and violation of the South Carolina Unfair Trade Practices Act (Count Four). Defendants raise new arguments in support of summary judgment on each of these remaining claims.

## STANDARD OF REVIEW

To grant a motion for summary judgment, the court must find that "there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c). The judge is not to weigh the evidence but rather to determine if there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All evidence should be viewed in the light most favorable to the non-moving party. *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123–24 (4th Cir.1990). "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.*, 947 F.2d 115, 119 (4th Cir.1991).

"[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The "obligation of the nonmoving party is 'particularly strong when the nonmoving party bears the burden of proof.'" *Hughes v. Bedsole*, 48 F.3d 1376, 1381 (4th Cir.1995) (quoting *Pachaly v. City of Lynchburg*, 897 F.2d 723, 725 (4th Cir.1990)). Sum-

mary judgment is not "a disfavored procedural shortcut," but an important mechanism for weeding out "claims and defenses [that] have no factual bases." *Celotex*, 477 U.S. at 327, 106 S.Ct. 2548.

## ANALYSIS

The court begins by considering whether Defendants are entitled to summary judgment on Plaintiffs' antitrust claims, and then considers Defendants' remaining arguments on Plaintiffs' state law claims.

### A. Plaintiffs' Federal Antitrust Claims[5]

Under federal antitrust law, the Sherman Act is violated only by agreements which unreasonably restrain trade. *See generally Standard Oil of N.J. v. United States*, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911). To assess the reasonableness of a restraint on trade, courts have taken one of two approaches. The first method—the so-called *per se* analysis—involves certain kinds of agreements whose effect on competition is so egregious that they can be deemed to be unreasonable without proof of anti-competitive effect. *See, e.g., NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 133, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998). "An agreement of such a kind is unlawful *per se*." *Id.* (citing *United States v. Socony–Vacuum Oil Co.*, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940)); *see also National Soc. of Prof. Engineers v. United States*, 435 U.S. 679, 692, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978) ("In the first category are agreements whose nature and necessary effect are so plainly anticompetitive that no elaborate study of the industry is needed to establish their illegality—they

---

**5.** As Defendants point out, the court's finding with respect to liability on Plaintiff's federal antitrust claims will be dispositive of the state law antitrust claim. *See, e.g., Steuer and Latham, P.A. v. Nat'l Med. Enters. Inc.*, 672 F.Supp. 1489, 1521 (D.S.C.1987) (holding that South Carolina has long adhered to a policy of following federal precedents in matters relating to state trade regulation enforcement).

are 'illegal *per se.*' "). The second category of antitrust violation involves agreements which are not deemed to be *per se* violations of the antitrust laws. Such agreements are evaluated under a "rule of reason" analysis, weighing the pro-competitive and anti-competitive effects of the agreement in question. *See generally Chicago Bd. of Trade v. United States*, 246 U.S. 231, 38 S.Ct. 242, 62 L.Ed. 683 (1918).

**1. Per Se Analysis versus Rule of Reason Analysis**

A threshold question for this court is whether the agreement in question fits into one of the narrowly delineated agreements deemed to be *per se* violations. "Among the practices which the courts have heretofore deemed to be unlawful in and of themselves are price fixing, division of markets, group boycotts, and tying arrangements." *Northern Pac. Ry. Co. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958) (citations omitted). Defendants argue that the *per se* approach is not applicable in the matter *sub judice* because (1) courts have consistently applied the rule of reason approach to restraints in the healthcare industry, and particularly to restraints involving the denial or revocation of hospital privileges; (2) the rule of reason approach has been expressly recognized as the appropriate approach to apply to the very restraint at issue in this case; and (3) the rule of reason approach is appropriate because Plaintiffs have no evidence that the medical staff defendants have market power in the relevant market, nor have Plaintiffs shown that the ABMS bylaw has had any effect on competition. (Def. Mem. at 12–15). Plaintiffs, on the other hand, argue that Defendants have engaged in a group boycott, that group boycotts must be analyzed under the *per se* approach, and that the precise type of boycott at issue in this case has been analyzed using the *per se* approach by at least one court of appeals.[6] Moreover, Plaintiffs contend that the *per se* rule can be applied without any showing of market power or harm to the market.

In *Arizona v. Maricopa County Medical Soc'y*, 457 U.S. 332, 339, 102 S.Ct. 2466, 73 L.Ed.2d 48 (1982), the Supreme Court considered the types of alleged antitrust violations warranting application of the *per se* analysis. In *Maricopa*, a group of defendant medical societies had established a schedule of maximum fees that their member physicians agreed to accept as payment from patients insured under plans approved by those societies. *Id.* In applying a *per se* analysis to the price fixing agreement at issue, the Court reasoned that the *per se* approach was appropriate where (1) rudimentary economic principles suggest that particular business practices, such as price-fixing, nearly always have anticompetitive effects, and (2) judicial experience with a certain kind of restraint "enables the Court to predict with confidence that the rule of reason will condemn it." 457 U.S. at 343, 344, 102 S.Ct. 2466.[7]

---

6. As explained by the Ninth Circuit, antitrust plaintiffs often "seek initially to have the defendant's conduct classified as a per se violation because it greatly simplifies the proof required." *Bhan*, 929 F.2d at 1410.

7. The Court also elaborated on the justifications for the existence of a *per se* rule. These include: (1) bypassing the significant costs involved in elaborate inquiry into the reasonableness of a challenged business practice when such practices almost always have an anticompetitive effect; (2) judicial convenience, when the judiciary already has experience with a particular kind of restraint and can automatically apply a *per se* rule; (3) certainty within the business community that courts will disapprove of certain types of business practices; and (4) the advancement of Congressional action to amend antitrust law; in the Court's opinion, Congressional action is furthered by unequivocal judicial pro-

Several years later in *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.*, 472 U.S. 284, 295, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985), the Court reiterated that a "plaintiff seeking application of the per se rule must present a threshold case that the challenged activity falls into a category likely to have predominately anticompetitive effects." *See also Federal Trade Commission v. Indiana Federation of Dentists*, 476 U.S. 447, 458–59, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) (refusing to extend the per se rule to cases in which the defendants lack market power or the economic impact of the challenged activity is not immediately apparent); *Betkerur v. Aultman Hosp. Assn.*, 78 F.3d 1079, 1089 (6th Cir.1996) ("[a] court should find a *per se* antitrust violation only when prior cases have established the anticompetitive effects of a sufficiently similar business practice.")

Plaintiffs attempt to satisfy this requirement by classifying the alleged violation as a group boycott,[8] and directing the court to *Weiss v. York Hosp.*, 745 F.2d 786 (3d Cir.1984).[9] In *Weiss*, the defendant hospital was alleged to have strictly scrutinized all applications for privileges made by DOs, a practice that often resulted in DOs being denied privileges. Conversely, applications made by MDs were essentially rubber-stamped. *Id.* at 795. The district court held that the alleged antitrust violation was subject to *per se* analysis, and the Third Circuit agreed. *Id.* at 820. The court explained its decision to employ a *per se* approach, including a discussion of why the rule of reason approach was not applicable on the facts before it, as follows:

The Medical Staff is, however, entitled to exclude individual doctors, including osteopaths, on the basis of their lack of professional competence or unprofessional conduct. If York's policy toward D.O.'s could be viewed as a form of industry self-regulation of this type, the rule of reason, rather than a *per se* rule, would be applicable. We recognize, therefore, that in many cases involving exclusion from staff privilege, courts will, more or less openly, have to utilize a rule of reason balancing approach. This case is different, however, because York has not contended that osteopaths as a group are less qualified than M.D.s. In the absence of such a contention, or another legitimate explanation for the discrimination, we conclude that a *per se* rule should be applied, since the effect of the practice is identical to that of the

nouncements that certain business practices are *per se* violations while others are not. *Maricopa*, 457 U.S. at 343–44, 354, 102 S.Ct. 2466.

Of particular relevance to the present dispute, the *Maricopa* Court noted that *per se* treatment would not normally be appropriate when the challenged conduct was "premised on public service or ethical norms." 457 U.S. at 348–49, 102 S.Ct. 2466.

8. As a threshold matter, the court notes that "[a] group boycott is not, contrary to [Plaintiffs'] contentions, always a *per se* violation." *Ginzburg v. Memorial Healthcare Systems, Inc.*, 993 F.Supp. 998, 1024 (S.D.Tex.1997); *see also Northwest Stationers*, 472 U.S. at 298, 105 S.Ct. 2613 ("[t]he mere allegation of a concerted refusal to deal does not suffice be-

cause not all concerted refusals to deal are predominantly anticompetitive."); *Mackey v. Nat'l Football League*, 543 F.2d 606, 619 (8th Cir.1976) ("To outlaw certain types of business conduct merely by attaching the 'group boycott' and 'per se' labels obviously invites the chance that certain types of reasonable concerted activity will be proscribed.").

9. Essentially, the parties' arguments come down to whether this court will follow *Weiss v. York Hosp.*, 745 F.2d 786 (3d Cir.1984), in which the Third Circuit applied a per se analysis to a boycott of D.O.s at a Pennsylvania hospital, or *Flegel v. Christian Hosp. Northeast–Northwest*, 4 F.3d 682 (8th Cir.1993), in which the Eight Circuit applied the rule of reason to a similar restraint.

traditional boycott, and plainly anticompetitive.

*Id.* (internal citations and footnotes omitted). Defendants, on the other hand, argue that this case is more analogous to *Flegel v. Christian Hosp. Northeast–Northwest,* 4 F.3d 682 (8th Cir.1993), in which the Eight Circuit refused to apply a *per se* approach to the precise type of restraint at issue in *Weiss* and in the matter *sub judice.* In *Flegel,* like here and in *Weiss,* the plaintiff DOs asserted that the defendant hospital and its staff conspired in a group boycott to exclude them from practice privileges at the hospital. *Id.* at 684–85. The *Flegel* court began its analysis by noting that "the courts of appeals have generally examined the denial or revocation of hospital privileges under the rule of reason." *Id.* at 686, *citing Oksanen,* 945 F.2d at 708–09 (analyzing the denial or revocation of staff privileges under the rule of reason); *Bhan v. NME Hospitals, Inc.,* 929 F.2d 1404, 1411–12 (9th Cir. 1991); *Oltz v. St. Peter's Community Hosp.,* 861 F.2d 1440, 1445 n. 1 (9th Cir. 1988); *Goss v. Memorial Hosp. Sys.,* 789 F.2d 353, 354–55 (5th Cir.1986) (declining to apply the *per se* rule to a physician's claim that the hospital for which he worked and its medical staff conspired to deprive him of his staff privileges). According to the *Flegel* plaintiffs, however, each of these decisions was distinguishable because they involved "individual determinations of incompetence or unprofessional conduct rather than exclusion of a class of medical service providers such as D.O.s." *Id.* The Eight Circuit disagreed, finding that rule of reason analysis was appropriate because (1) "[a]lthough several of the relevant decisions by the courts of appeals

have involved individualized denial or revocation of privileges, that cannot be said of all such cases"[;] and (2) even under the reasoning of *Weiss,* the restraint was subject to rule of reason analysis because the exclusion from staff privileges was a form of "industry self-regulation" not appropriate for *per se* treatment. *Id.* at 687; *see Weiss,* 745 F.2d at 820 (noting in dicta that "[i]f [the defendant hospital's] policy toward D.O.s could be viewed as a form of industry self-regulation of this type, the rule of reason rather than a *per se* rule, would be applicable.").

■ Contrary to Plaintiffs' suggestions, this court finds *Flegel* more instructive than *Weiss.* First, much like the D.O.s in *Flegel,* Plaintiffs were not subjected to more discriminatory treatment than M.D.s—the bylaw only required that both be certified by a board recognized by the ABMS in order to obtain hospital privileges. *See, e.g., Flegel v. Christian Hospital Northeast–Northwest,* 804 F.Supp. 1165 1172 (E.D.Mo.1992) ("In the present case, the same standards are applied to both osteopathic (D.O.) and allopathic (M.D.) physicians. Assuming that the standards were based upon allopathic, rather than osteopathic standards, they were still applied equally to all applicants."); Amara Dep. at 17, 28 (osteopathic member of the Medical Staff testifying that he was not aware of anti-osteopathic treatment at the Medical Center).[10] In contrast, the alleged discrimination was much more flagrant in *Weiss.* In *Weiss,* the defendant hospital admitted all M.D.s who applied for staff privileges with only a cursory review, but strictly scrutinized any D.O. applicant's medical qualifications and "social accepta-

---

**10.** Notably, the Medical Center does have five D.O.s on its staff at present (including Dr. Amara) none of whom detail *Weiss*-like mistreatment. *See* Tobin Dep. at 69–70; Love Dep. at 55. The court is unsure as to whether

each of these D.O.s satisfied the bylaw requirement by undertaking their training at allopathic medical facilities, and ultimately passing the ABMS boards, but presumes that this is the case with each.

bility." *See Weiss,* 745 F.2d at 795. In other words, in *Weiss,* unlike in the present case, the challenged actions were taken simply based on the plaintiffs' status as D.O.s and without regard to board certification or any other indicia of the quality of services they were likely to offer patients.

Moreover, in *Weiss,* the court expressly acknowledged that "a hospital could exclude an applicant from staff privileges either because he is not medically qualified or because of unprofessional conduct, so long as the hospital applies the same standards to all applicants." 745 F.2d at 821 n. 60 (recognizing that "restricting medical staff privileges to doctors who have achieved a specified level of medical ability falls within the scope of a hospital's 'public service' function, and therefore the rule of reason analysis, not the *per se* rule of illegality, would control.").[11] Given that, like in *Flegel,* the same standards have been applied to D.O.s and to M.D.s in this case, even under the reasoning of *Weiss,* then, rule of reason analysis is appropriate. Moreover, the evidence in this case suggests that the bylaw requirement at issue, adopted over twenty years ago, is appropriately characterized as "industry self regulation[,]" *see Weiss,* 745 F.2d at 820, rather than an attempt to quell competition.[12] *See, e.g., Miller v. Indiana*

*Hosp.,* 843 F.2d 139, 144 n. 6 (3rd Cir.1986) (noting that in *Weiss,* the court "recognized that in a hospital staff privilege case in which the hospital defends on lack of professional ability, the rule of reason test would apply.").

In short, the court adheres to the majority view that the *per se* rule should be invoked only "when the challenged activity would almost always tend to be predominantly anticompetitive." *Bhan,* 929 F.2d at 1412; *see also Oksanen,* 945 F.2d at 708 ("the category of restraints classed as group boycotts should not be expanded indiscriminately, particularly where ... the economic effects of the restraint are far from clear."); *Retina Assocs., P.A. v. Southern Baptist Hosp. of Florida, Inc.,* 105 F.3d 1376, 1381 (11th Cir.1997) ("[T]he recent jurisprudence of the Supreme Court and of the Court of Appeals of this Circuit cautions against the haphazard expansion of the group boycott label and the concomitant imposition of *per se* liability."). Here, the practice of which Plaintiffs complain can be cast in the following general terms: physicians conspiring amongst themselves, and with the Medical Staff, to allow only MDs, rather than DOs, to offer services in the hospital. As in *Bhan* and *Flegel,* "this activity does not appear to be

---

**11.** Pursuant to this reasoning, courts have generally been reluctant to:

> hold that a group of physicians who decide that they do not want to refer patients to a particular surgeon, because they doubt his qualifications, have committed a *per se* violation of the Sherman Act. Because actions on the part of hospitals and physicians, which might resemble group boycotts, may well be mandated by an ethically grounded concern for patients' well-being ... such behavior, in the medical service industry, should be analyzed in terms of the rule of reason.

> *Ginzburg,* 993 F.Supp. at 1025, *quoting Pontius v. Children's Hospital,* 552 F.Supp. 1352, 1366 (D.C.Pa.1982). Similarly here, because

the hospital may reasonably make credentialing decisions regarding qualifications necessary to ensure patients' well-being, the court should not employ a *per se* approach to analyze the behavior at issue.

**12.** As an additional reason for rejecting *Weiss,* the court notes that it was decided before *Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 295, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985). As discussed above, in *Northwest Wholesale,* the Court unequivocally held that a "plaintiff seeking application of the per se rule must present a threshold case that the challenged activity falls into a category likely to have predominately anticompetitive effects." *Id.*

one that is always anticompetitive." *Bhan,* 929 F.2d at 1412; *Flegel,* 804 F.Supp. at 1172. The *Bhan* court's reasoning is instructive:

> On the one hand, hospitals must make choices about the types of qualifications a practitioner must have to apply for staff privileges in various fields of practice. These restrictions help it provide more efficient, higher quality service in order to compete against other hospitals. This also helps reduce its malpractice exposure. Thus, the choice of physician over nonphysician providers may actually sharpen competition by making [defendant hospital] a more attractive competitor in the patient market.
>
> On the other hand, a plaintiff may be able to establish in a certain situation that the physicians are conspiring to drive the nurses out of business because their services are just as good but cheaper. The hospital may be shown to be acceding to the doctors' wishes because of its wish to retain certain of the doctors' services. In that case, the practice of excluding nonphysician providers as a class would appear to be anticompetitive.

In sum, the practice of excluding non-physicians in favor of physicians is not one that always would have an anti-competitive effect. Given that the effect of the practice is unclear, it is appropriate to apply the rule of reason.

*Id.;* [13] *see also BCB Anesthesia Care Ltd. v. Passavant Mem. Area Hosp. Ass'n,* 36 F.3d 664, 667 (7th Cir.1994) (noting that courts "invariably analyze" antitrust claims based on hospital credentialing decisions under the rule of reason because "there is nothing obviously anticompetitive about a hospital choosing one staffing pattern over another or in restricting the staffing to some rather than many or all."). Accordingly, the court proceeds to an analysis of Plaintiffs' claims under the rule of reason analysis.[14]

### 2. Application of the Rule of Reason to the Matter *Sub Judice*

 Under a rule of reason analysis, "the reasonableness of a restraint is evaluated based on its impact on competition as a whole within the relevant market." *Oksanen,* 945 F.2d at 708; *see also Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433

---

13. The D.C. Circuit reached a similar conclusion in *Kreuzer v. American Academy of Periodontology,* 735 F.2d 1479 (D.C.Cir.1984). In *Kreuzer,* the court held that the rule of reason analysis governed a section 1 challenge to a rule promulgated by the American Academy of Periodontology (AAP) that limited membership in the AAP to licensed dentists who practice periodontics exclusively, and who do not practice other forms of dentistry. *Id.* at 1492. While the court labeled the effect of the AAP's rule a "group boycott," it nonetheless concluded that "[w]hen a conspiracy of this sort is alleged in the context of one of the learned professions, the nature and extent of its anticompetitive effect are often too uncertain to be amendable to *per se* treatment." *Id.*

14. The parties also argue about whether market power must be considered in determining whether the rule of reason or *per se* approach applies. Because the court has concluded that the challenged practice is not "predominantly anticompetitive," it need not determine whether market power is a relevant inquiry. *See Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284, 295, 105 S.Ct. 2613, 86 L.Ed.2d 202 (1985) (holding that a plaintiff seeking application of the *per se* rule must present a threshold case that the challenged activity falls into a category likely to have predominately anticompetitive effects). Were the court to reach this inquiry, it would conclude that market power is a relevant consideration. *See, e.g., Indiana Fed'n,* 476 U.S. at 458–459, 106 S.Ct. 2009 ("[T]he *per se* approach has generally been limited to cases in which firms with market power boycott suppliers or customers in order to discourage them from doing business with a competitor...."

U.S. 36, 49, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977) (holding that rule of reason analysis requires "the factfinder [to weigh] all of the circumstances of the case in deciding whether a restrictive practice should be prohibited as imposing an unreasonable restraint on competition."). This evaluation requires a showing of "anticompetitive effect" resulting from the agreement in restraint of trade. "To have an anticompetitive effect, conduct must harm the competitive process and thereby harm consumers." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 206 (4th Cir.2002) (internal quotations omitted). "[H]arm to one or many competitors will not suffice." *Id.* "The [Sherman Act] directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself." *Id.* (internal quotation marks omitted). Under controlling Fourth Circuit precedent, "an inquiry into the lawfulness of the restraint begins by identifying the ways in which a challenged restraint might possibly impair competition." *Id., citing* 7 Areeda & Hovenkamp ¶ 1503a, at 372. After this threshold inquiry, the court must proceed "to determine whether that harm is not only possible but likely and significant," which entails an "examination of market circumstances," including market power and share. *Id.; see also Oksanen,* 945 F.2d at 709 ("Under the rule of reason, Oksanen bears the burden of proving that the actions of the defendants have unreasonably restrained trade. To meet this burden, Oksanen must prove what market he contends was restrained and that the defendants played a significant role in the relevant market. Absent this market power, any restraint on trade created by the defendants' actions is unlikely to implicate section one.").

■ Defendants do not appear to dispute that the restraint alleged by Plaintiffs could conceivably restrain competition. Instead, Defendants contend that Plaintiffs have failed to offer evidence that could allow a reasonable jury to conclude that Defendants have market power. (Def. Mem. at 16). As Defendants note, defining the relevant market is essential to Plaintiffs' antitrust claims, as the definition of the relevant market is a prerequisite to determining whether Defendants possess market power. The relevant market generally can be defined as the "framework within which the competitive impact of conduct is assessed." 2 Julian O. Von Kalinowski, ANTITRUST LAWS AND TRADE REGULATION § 24.01[1] (2002). For purposes of antitrust analysis, a relevant market consists of (1) a product market, and (2) a geographic market. The relevant product market identifies the products that compete with each other as defined by "the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." *Brown Shoe Co. v. United States,* 370 U.S. 294, 325, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962). The relevant geographic market is defined as "the area in which buyers or sellers of the product effectively compete," *Consul, Ltd. v. Transco Energy Co.,* 805 F.2d 490, 495 (4th Cir.1986), and the area "to which their customers could practicably turn for alternative sources of such products." *M & M Med. Supplies & Serv. v. Pleasant Valley Hosp.,* 981 F.2d 160, 170 (4th Cir.1992).

Numerous courts have recognized that defining specific product and geographic markets is a complicated task requiring the consideration of detailed economic information. *See, e.g., Cogan v. Harford Memorial Hosp.,* 843 F.Supp. 1013, 1020 (D.Md.1994) ("To allow a jury to make a finding as to the geographic market, [the plaintiff] must provide the Court with expert testimony on this highly technical economic question."); *Victus, Ltd. v. Collez-*

*ione Europa U.S.A., Inc.*, 26 F.Supp.2d 772, 786 (M.D.N.C.1998) (noting that defining relevant product markets is a "difficult economic question"). Here, the parties agree that the relevant product market is the market for orthopedic surgery. Definition of the appropriate geographic market, however, is thoroughly disputed by the parties. In essence, the dispute is whether the relevant geographic market is solely the town of Hilton Head Island, as Plaintiffs contend, or, as Defendants suggest, the entirety of Beaufort County. *See* Pl. Opp. at 18 ("[The] market area is not the entire county. Rather, it is more narrowly, and accurately defined as, essentially, Hilton Head Island."). Moreover, the parties dispute whether the unique features of Hilton Head Island as a tourist destination for some 2.5 million visitors annually impacts the definition of the geographic market, or Defendants' market power.

As Plaintiffs argue, "definition of the relevant geographic market … is a question of fact to be determined in the context of each case in acknowledgment of the commercial realities of the industry under consideration." *See Lansdale v. Philadelphia Electric Co.*, 692 F.2d 307, 311 (3d Cir.1982); *see also Oahu Gas Serv., Inc. v. Pac. Resources Inc.*, 838 F.2d 360, 363 (9th Cir.1988) ("Our previous decisions establish that both market definition and market power are essentially ques-

tions of fact."); *Weiss*, 745 F.2d at 825 ("Market definition is a question of fact."); *Precision Piping & Instruments, Inc. v. E.I. duPont De Nemours and Co.*, 707 F.Supp. 225, 230 (S.D.W.Va.1989) (denying summary judgment when "the jury might reasonably find the identified product market to be an appropriate one under the facts in this case. Furthermore, the Plaintiff's identification of a range of geographic markets is sufficient to place that question before the jury…."). Here, given the factual disputes surrounding the correct geographical market, including any unique features of Hilton Head Island that may be relevant to this inquiry, the court finds that summary judgment is inappropriate.[15]

### 3. Evidence of a Conspiracy

Defendants next argue that Plaintiffs' claims fail because Plaintiffs have failed to proffer sufficient evidence that Defendants conspired to restrain trade. To establish a § 1 violation, a plaintiff must show: "(1) a contract, combination, or conspiracy, (2) that imposed an unreasonable restraint of trade." *Dickson*, 309 F.3d at 202. A plaintiff can offer direct or circumstantial evidence to prove concerted action. *Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). "Direct evidence is extremely rare in antitrust cases and is usually referred to as the 'smoking gun.'" *American Chiropractic Assoc. Inc.*

---

**15.** Defendants raise additional arguments as to why they do not possess market power. For example, Defendants, basing their arguments on their expert's testimony, contend that

Defendants do not have market power due to the significant outflow of Beaufort County patients to hospitals outside the county, and due to the significant share of orthopedic surgery patients that leave Hilton Head Island to obtain service from physicians who perform orthopedic surgical services at Beaufort Memorial Hospital.

(Def. Mem. at 15). Because the relevant geographical market is in dispute, the court cannot make a determination of market power. *See, e.g., Loiterman v. Antani*, 1991 WL 117209, *3 (N.D.Ill. June 25, 1991) (noting that once "the geographic market becomes a fact in dispute," the court "cannot reach a determination on the critical question of market power; therefore the question must go to the trier of fact….").

v. Trigon Healthcare, 367 F.3d 212, 227 (4th Cir.2004), quoting InterVest, Inc. v. Bloomberg, L.P., 340 F.3d 144, 159 (3d Cir.2003). "The antitrust plaintiff, when faced with a summary judgment motion, must merely offer significant probative evidence to support its case." Trident Neuro–Imaging Laboratory v. Blue Cross Blue Shield of South Carolina, 568 F.Supp. 1474, 1478 (D.S.C.1983). "If reasonable inferences drawn from all of the evidence—which must be viewed in the light most favorable to the plaintiff—indicate the existence of a conspiracy, the plaintiff has introduced a sufficient basis for proceeding to trial." Id. Nonetheless, the Supreme Court has instructed that when there is evidence of conduct that is consistent with both legitimate competition and an illegal conspiracy, courts may not infer that an illegal conspiracy has occurred without other evidence. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

 Plaintiffs here do not purport to have direct evidence of concerted action, but instead, argue that abundant circumstantial evidence of a conspiracy to restrain trade exists. This court has studied the allegations made by Plaintiffs, and concludes that there is sufficient evidence from which to draw reasonable inferences of the existence of a conspiracy for purposes of surviving summary judgment. First, as Plaintiffs note, Defendants have maintained, throughout this litigation, that the ABMS bylaw requirement was adopted in 1974 when the hospital first commenced operations and has remained as simply a relic of that early enactment. One of the founding physicians testified that the ABMS bylaw requirement was modeled upon a bylaw from a hospital where he held privileges prior to joining the staff at Hilton Head in an effort to increase the quality of medical care, and that the bylaw operated from "Day One" when the hospital opened. (Lamotte Dep. at 14, 16). However, after further discovery, it appears that the ABMS bylaw requirement was not adopted until 1990,[16] and has been revisited on numerous occasions since Plaintiffs' recent applications for privileges. (Pl. Supp. Mem. at 4).

Second, Plaintiffs point to evidence that a proposed amendment to the bylaw requirement was considered within the last few years. According to Plaintiffs, Defendants have attempted to obfuscate this fact by insisting, untruthfully, that the bylaw requirement has been in existence since the hospital's inception. The proposed amendment would have allowed the Board to waive the ABMS requirement for "an active Medical Staff member upon recommendation by the Medical Executive Committee and in the Board's sole discretion without right to appeal." Dr. Kenneth Kunze, the Regional Chief Medical Officer of Tenet Healthcare and former medical director of the Hilton Head Hospital first affirmed by affidavit that the proposed amendment was "developed during the mid-to-late 1980s to address circumstances involving a particular member of the Medical Staff ... [who] was an M.D., not a D.O." (Kunze Aff. ¶ 5). Moreover, Kunze

---

**16.** Relatedly, Plaintiffs have submitted a Rule 56(f) affidavit averring that they need more time for discovery because of Defendants' late disclosure that the bylaw was not enacted until 1990. See, e.g., Harrods Ltd. v. Sixty Internet Domain Names, 302 F.3d 214, 244 (4th Cir.2002) ("[i]f a party believes that more discovery is necessary for it to demonstrate a genuine issue of material fact, the proper course is to file a Rule 56(f) affidavit."). Defendants have agreed to allow additional depositions in accordance with this affidavit. This recent disclosure, and the fact that some discovery continues, also militates against the granting of summary judgment in favor of Defendants.

averred "without reservation or qualification, that the proposed amendment had nothing to do with the eligibility of osteopaths or membership on the Hilton Head Medical Staff." *Id.* at ¶ 6. Later, however, Kunze reneged this testimony, and now affirms that the bylaw provision was contemplated, and ultimately rejected, in the last several years in reference to allowing an osteopath to remain on the Medical Staff. (Kunze Dep. at 60–61). According to Plaintiffs, this demonstrates that the members of the Medical Staff have actively considered, and attempted to prevent, osteopathic membership on the medical staff in recent history, as opposed to simply keeping a remnant bylaw on the books since the inception of the hospital as Defendants suggest. At this stage of the litigation, and without additional evidence, the court cannot say that no reasonable jury could conclude that the medical staff member defendants' rejected this bylaw as part of concerted action to restrain competition from osteopaths, as their motivations are simply not clear upon the present record.

Next, Plaintiffs cite actions of the Board of Governors following their applications as evidence of concerted action to restrain trade. After Plaintiffs applied for privileges, the Executive Committee of the Board of Governors held a meeting, and noted in its Minutes that it "would like to initiate a requirement that Doctors of Osteopath[y] must be American Board certified." (Venable Dep., Ex. 1). This item was to be voted on at the General Staff meeting. While Defendants attempt to explain this reference as "somewhat cryptic" and "a transcription mistake[,]" *see* Def. Reply at 19, the court believes that genuine issues of material fact exist as to whether, as Plaintiffs suggest, the Board of Governors and medical staff concertedly took this action to strengthen their position that no osteopaths would be able to obtain staff membership in an attempt to eliminate competition. Moreover, Plaintiffs have produced evidence that, over the years, several allopathic physicians without ABMS certification have been allowed medical staff membership. (Honts Dep. at 68; Kunze Dep. at 81–85). According to Plaintiffs, the presence of other allopathic physicians without ABMS board certification on the medical staff is circumstantial evidence of the implicit conspiracy by members of the medical staff to favor allopaths over osteopaths.[17]

In short, while Defendants attempt to explain how each of these acts cannot possibly establish conspiratorial conduct to any rational juror, in the court's opinion, genuine issues of material factual dispute exist. The court cannot conclude that, as a matter of law, no rational juror could believe that any of the aforementioned acts were conspiratorial actions taken to prevent competition from osteopaths. Because the court is not to weigh the evidence before it and must view all evidence in Plaintiffs' favor, summary judgment is inappropriate. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505,

---

17. Plaintiffs cite other circumstantial evidence of a conspiracy, including the medical staff's elimination of the category of staff their applications were submitted under, the "Affiliate Active Staff" category. In Plaintiffs' view, this action was taken in direct response to their applications, and further evidences the conspiracy amongst members of the medical staff. Moreover, Plaintiffs argue that the medical staff defendants' refusal to refer patients to Plaintiffs is "indicative of the continuing conspiracy to prevent Plaintiffs from competing in the market." (Pl. Opp. at 28). As the court has concluded there is sufficient circumstantial evidence of conspiratorial action to survive summary judgment without these allegations, in the interest of brevity, the court refrains from addressing whether these also potentially evidence a conspiracy to unlawfully restrain trade.

91 L.Ed.2d 202 (1986). As the Supreme Court stated in *Poller v. Columbia Broadcasting System, Inc.,* 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962):

> We believe that summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot.

*Id.* at 473, 82 S.Ct. 486. As in *Poller,* Plaintiffs have presented enough circumstantial evidence to allow the jury to consider whether Defendants' acted collusively with motive and intent to restrain competition. While it may be true that "upon all of the evidence a jury would be with the [Defendants]," the court simply "cannot say on this record that it is quite clear what the truth is." *Id.*[18]

### 4. Antitrust Injury

 Defendants' final argument with respect to the federal antitrust claims is that Plaintiffs have not proven a sufficient antitrust injury to withstand summary judgment. Antitrust injury is an injury from unlawful acts that results in reduced output or higher prices for consumers. *Continental Airlines,* 277 F.3d at 516. "[A] plaintiff cannot demonstrate the unreasonableness of a restraint merely by showing that it caused him an economic injury." *Oksanen,* 945 F.2d at 708. In considering whether an antitrust injury exists, "the reasonableness of a restraint is evaluate based on its impact on competition as a whole within the relevant market." *Id.*

 Here, while Defendants argue that summary judgment is appropriate because Plaintiffs' have failed to establish an antitrust injury, the court disagrees for several reasons. First and foremost, as discussed above, the factual disputes surrounding the relevant market render it impossible for this court to determine the effect of any restraint on competition within that market. Secondly, at the summary judgment stage, Plaintiffs are entitled to all reasonable inferences from the evidence presented, and need only establish a genuine issue of material fact with regard to the existence of antitrust injury. *See R.C. Bigelow, Inc. v. Unilever N.V.,* 867 F.2d 102, 107–11 (2d Cir.1989). Plaintiffs have proffered a report prepared by a consultant demonstrating that Plaintiffs were charging less for some services than other orthopedic practices in the area, leading the court to believe that, should Plaintiffs be able to prove their allegations of a conspiracy to restrain osteopaths from entering the relevant market, a cognizable antitrust injury could exist. Moreover, if it is ultimately proven that Defendants refused to refer patients to Plaintiffs as part of their unlawful conspiracy, this could similarly establish that consumers and competition were harmed by Defendants' alleged practices by facing artificial-

---

**18.** The 90 individual practitioner Defendants ("practitioner Defendants") have joined in the collective motion for summary judgment, but have their own additional supporting memorandum. In this memorandum, the practitioner Defendants largely reiterate arguments made in the collective memorandum, but highlight the argument that Plaintiffs have not specifically identified individual practitioners involved in a conspiracy to restrain trade. The practitioners argue that because the bylaw has "existed for decades[,]" Plaintiffs can-

not prove a conspiracy. (Practitioner Def. Mem. at 13). The court believes, however, that this argument misapprehends the proof Plaintiffs rely on for evidence of a conspiracy. As discussed above, rather than the simple existence of the bylaw, Plaintiffs, in their opposition memorandum, cite actions taken by the medical staff, of which the ninety practitioners are members, that could reasonably evidence a conspiracy to prevent competition from osteopaths.

ly high practices or depriving consumers of fair choice among providers of medical services. *See, e.g., FTC v. Indiana Federation of Dentists*, 476 U.S. 447, 459, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986).

## B. Plaintiffs' State Law Antitrust Claims

As mentioned above, Plaintiffs' state law antitrust claim is judged on the merits by the same standard as their Sherman Act claim. *See Steuer*, 672 F.Supp. at 1521. The court has concluded that, on the merits, the federal antitrust claim must proceed to trial, but Defendants argue that summary judgment is appropriate on the state law antitrust claim because Plaintiffs' claim for relief is moot.[19] As Defendants note, Plaintiffs' state antitrust claim only seeks injunctive relief. *See* Sec. Am. Compl. ¶ 61; Pl. Opp. at 8. According to Defendants, during the course of this litigation, the Medical Executive Committee has approved a motion to seek a change in the bylaws to accept applications for staff membership from physicians certified by AOA boards. (Clodfelter Dep. at 16–17). However, contrary to Defendants' argument, it is not clear from the record that this recommendation has been approved by the medical staff (rather, only that it is under consideration), *see id.*, nor that "[i]f Plaintiffs applied tomorrow, their applications would be eligible to be processed as would any other AOA-boarded physician."

(Def. Reply at 21). Because the court remains unsure as to the status of the change of the bylaw requirement, at this point, Plaintiffs' claim for injunctive relief remains viable.

## C. Interference with Contractual Relationships

■ Defendants next argue that they are entitled to summary judgment on Plaintiffs' claim for intentional interference with contractual relationships because Plaintiffs have not identified "any actual contracts Plaintiffs had with third-party payors, patients, or anyone else that were breached as a result of the rejection of their applications for privileges." (Def. Mem. at 21). Intentional interference with contract requires three elements: (1) the defendant intentionally interfered with the plaintiff's existing or potential contractual relations, (2) for an improper purpose or by improper methods, which (3) caused injury to the plaintiff. *Crandall Corp. v. Navistar Int'l Transp. Corp.*, 302 S.C. 265, 395 S.E.2d 179 (1990).

■ Plaintiffs argue that their relationships with patients had to be wrongfully terminated as a result of their denial of hospital privileges. Essentially, Plaintiffs' position is that while they were able to perform non-surgical functions on patients at their Hilton Head offices, because they were denied staff privileges, they were

---

**19.** The practitioner Defendants seek summary judgment on this claim on an additional ground. They argue that the South Carolina antitrust act "is limited to cases involving the importation or sale of articles imported into this State or in the manufacture or sale of articles of domestic growth or of domestic raw material." (Practitioner Mem. at 15). In making this argument, however, the Practitioner Defendants rely on only one section of the South Carolina antitrust statute. The court disagrees that South Carolina law limits state antitrust claims in this manner, as another section of the South Carolina antitrust statute provides

> All arrangements, contracts, agreements, trusts or combinations ... (c) between two or more persons as individuals, firms, corporations, syndicates or associations that may lessen or affect in any manner the full and free competition in any tariff, rates, tolls, premium or prices in any branch of trade, business or commerce are declared to be against public policy, unlawful and void.

S.C.Code Ann. § 39–3–10 (1985).

precluded from performing any surgical procedures (which require hospital facilities). As a result, according to Plaintiffs, their patients had to seek treatment elsewhere. Defendants counter that "while Plaintiffs could not perform surgery at the Medical Center, they could, and did, take patients elsewhere to perform surgery[,]" including Beaufort Memorial Hospital, where they were allowed staff membership. (Def. Mem. at 22). Taking the facts in the light most favorable to Plaintiffs, it appears that they, at a minimum, had to ask patients to travel with them to undergo surgery, and that at least some patients refused to travel outside of Hilton Head for surgery. (Welchlin Dep. at 86; Pl. Opp. at 36). This certainly establishes that Plaintiffs were injured by Defendants' alleged actions. As for the other two elements of Plaintiffs' intentional interference with contract claim, genuine issues of material fact remain as to whether Defendants' actions were taken with an intent to injure the Plaintiffs, and for an improper purpose or by improper methods.[20] Accordingly, Defendants are not entitled to summary judgment on this claim.

## D. Plaintiffs' SCUTPA Claims

■ With respect to Plaintiffs' claim of a violation of the South Carolina Unfair Trade Practices Act (SCUTPA), Defendants argue that summary judgment is appropriate because there has been no unfair or deceptive conduct, the Plaintiffs have no actual damages, and the public interest has not been adversely affected by the conduct alleged. (Def. Mem. at 25–26).

Plaintiffs disagree, raising many of the arguments raised in prior sections of this Order. Because the questions of whether there has been unfair or deceptive conduct, and whether the public interest has been harmed, turn largely on the resolution of whether an antitrust violation has occurred, the court similarly believes factual issues remain and that summary judgment must be denied.

## E. Damages/Corporate Entity

Finally, Defendants contend that Plaintiffs have suffered no damages vis a vis the complained of conduct because they (1) cannot "recover the alleged losses of corporate entities that are not parties to this suit," and, in any event, (2) cannot demonstrate that any losses were proximately caused by Defendants. (Def. Mem. at 27) With respect to Defendants' first argument, Plaintiffs counter that they do not attempt to recover on behalf of the corporate entities, but rather, seek "personal damages including those amounts which were paid to Low Country."[21] The court believes Plaintiffs' claim for damages to be proper, and to the extent that Plaintiffs attempt to recover improper damages at trial, the court can remedy the situation at that time. Moreover, the question of whether Defendants' actions proximately caused Plaintiffs' damages is within the jury's province. For this reason, the court refrains from considering Defendants' additional arguments on damages, and finds summary judgment on this issue to be inappropriate.

20. Both of these elements are closely related to the determination of whether an antitrust violation occurred. Because, as discussed above in relation to the antitrust claims, questions of motive and intent are generally those for the jury, the court must deny summary judgment on the intentional interference with contract claim as well.

21. Low Country Orthopedics and Sports Medicine, LLC was a medical center opened on Hilton Head Island by Plaintiff Welchlin after he was denied medical staff privileges. (Welchlin Dep. at 127).

Defendants also ask this court to grant summary judgment in favor of the Tenet-related corporate entities other than the Medical Center on the grounds that none of these entities had anything to do with the adoption of the bylaw. Plaintiffs have produced recently-disclosed evidence that the bylaw was adopted as late as 1990, a date upon which they suggest Tenet had an ownership interest in the hospital. Defendants take issue with this suggestion, but the court believes that, yet again, factual issues permeate the question of Tenet's relationship to the Medical Center, both at present and in the past. Accordingly, the Tenet-related entities are not entitled to summary judgment for the reasons set forth herein, and in prior Orders of this court.

## CONCLUSION

It is therefore **ORDERED,** for the foregoing reasons, that Defendants' Motion for Summary Judgment is hereby **DENIED.**

**AND IT IS SO ORDERED.**